## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Joshua Bergeson | : | Case No. |
| (Plaintiff) | : | |
| | : | **JURY TRIAL DEMANDED** |
| vs. | : | **ELECTRONICALLY FILED** |
| | : | |
| City of New London, Brian Wright, and | : | |
| Matthew Galante | : | |
| (Defendants) | : | **January 15, 2025** |

## COMPLAINT

## INTRODUCTION

1. Plaintiff brings this action for monetary damages pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986, § 31-51(q) et seq. of the Connecticut General Statutes, and under the common law of the State of Connecticut, against Brian Wright and Matthew Galante in their individual capacities and against the City of New London.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law. As to those claims not arising under federal law but clearly so related to the claims in this action within the original jurisdiction of this Court, supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367.

1

2. It is alleged that the individual police officer defendants engaged in a conspiracy to deprive the Plaintiff of his constitutional rights, including but not limited to his First Amendment right of speech as well as his procedural and substantive due process rights. The actions of the defendants were part of a concerted effort to punish and silence the Plaintiff and to otherwise prevent him from engaging in protected activity – to wit challenging the decisions and actions of the defendants.

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut.

**PARTIES**

4. Plaintiff Joshua Bergeson (hereafter "Plaintiff," "Lieutenant Bergeson" or "President Bergeson") is a white male who resides in Baltic, Connecticut.  At all relevant times related to this complaint, Plaintiff was employed as a police officer working for the New London Police Department ("NLPD") in the City of New London.  Plaintiff holds the rank of Lieutenant, having been promoted to that rank in March of 2022.

5. Defendant City of New London is a municipal employer as defined by Connecticut General Statutes § 7-467 located at 181 State Street, New London, Connecticut. Defendant City of New London is a subdivision of the State of Connecticut and at all relevant times has been the employer of Plaintiff.

6. Defendant Brian Wright (hereafter "Chief Wright" or "Defendant Wright") is a resident of North Stonington, Connecticut and at all relevant times to this complaint has been employed by the City of New London as the police chief for the New London Police Department.  Wright was promoted to the Chief of Police in 2021 after serving as a police officer for nearly 30 years with the NLPD.  In his capacity as police chief and at

all relevant times to this complaint, Chief Wright acted as a superior officer to and supervisor of Plaintiff.

7. Defendant Matthew Galante (hereafter "Captain Galante" or "Defendant Galante") is a resident of Colchester, Connecticut and at all relevant times to this complaint has been employed by the City of New London and has served as a Captain in the New London Police Department.  In his capacity as a Captain with the New London Police Department and at all relevant times to this complaint, Captain Galante acted as a superior officer to and supervisor of Plaintiff.

8. On or around August 15, 2024, the undersigned counsel delivered a Statutory Notice of Claim Pursuant to Connecticut General Statutes § 7-465 to the City of New London City Clerk on behalf of Plaintiff.  A copy of the statutorily required notice is attached to this complaint as Exhibit A.

## STATEMENT OF FACTS

9. Plaintiff has been employed as a Police Officer with the City of New London Police Department since 2007.

10. At all times during Plaintiff's employment with Defendant City, he has performed his job duties in an exemplary manner.  Plaintiff's exemplary performance is evidenced by the NLPD's decision to consistently promote him to a higher rank and entrust him with greater responsibility.

11. In or around 2016, Plaintiff was promoted to the rank of Detective.

12. In or around 2019, Plaintiff was promoted to the rank of Sergeant.

13. In or around March of 2022, Plaintiff was promoted to the rank of Lieutenant and has served in this position through the present date.

14. In his capacity as a Lieutenant with the NLPD, Plaintiff is responsible for the supervision of sergeants and patrolmen, serving as shift commander, following all general orders and department requirements, and ensuring that his subordinates do the same.

15. As a police officer, Lt. Bergeson is required to report any instance of officer misconduct. General Order 11.6(C)(5) provides: "If an employee believes he/she has evidence of misconduct against a supervisor, he/she *shall forward* a written report regarding same to the Deputy Chief of Police in memo form."  As a supervisor, Lt. Bergeson is responsible not only for personally adhering to all General Orders but also is required to ensure that his subordinates do the same.

16. In recent years, the New London Police Department has received intense scrutiny and criticism for its employment and personnel practices.  The NLPD and its leadership have been the subject of numerous state and federal lawsuits alleging discrimination, retaliation, hostile work environment, civil rights violations and inappropriate or vindictive discipline of officers.

17. Local journalists have attempted to document the troubling dysfunction of the NLPD.  In an article from March of 2024, Staff Writer Greg Smith noted two high profile lawsuits were filed by police officers against the Department within the first three months of Defendant Wright's tenure as Chief.  In discussing yet another allegation made by an officer against the Department and its leadership, Smith noted "It's the latest in a volley of lawsuits, grievances, complaints and counter-complaints that have plagued the department over the past several years and led to lengthy internal and outside

4

investigations, and more recently settlements and a retirement.  The department has [dealt] with 23 union grievances last year, most of which have not been settled."[1]

18. It is in this environment and with a firm belief that sunlight is the best disinfectant that Lt. Bergeson ran for the position of union president.

19. In or around November of 2021, Plaintiff was elected President of the New London Police Union, Local 724.  The Plaintiff was elected to a two-year term with the next election occurring in October of 2023.

20. At all times relevant to this complaint, Defendant City of New London and the Police Union, Local 724, Council #4 AFSCME, AFL-CIO ("Union") were parties to a Collective Bargaining Agreement ("CBA" or "Agreement").

21. The Agreement sets forth certain rights and responsibilities of the Parties and provides meaningful procedural protections in order to safeguard the rights guaranteed pursuant to the Agreement.

22. In his capacity as Union President, Plaintiff was responsible for upholding and enforcing the terms of the Agreement, advocating for officers during disciplinary proceedings, voicing the concerns of officers, and serving as an intermediary between rank-and-file police officers and command staff.

23. In his role as Union President, the Plaintiff took his responsibilities seriously.  In this capacity he took an active role in advocating for union members, discussing personnel issues with command staff and City officials, and filing grievances when it appeared that important policies were being violated or that union members were otherwise not receiving fair and equal treatment.

---

[1] https://www.theday.com/local-news/20240309/lawsuits-grievances-and-complaints-continue-to-plague-new-london-police/

5

24. Chief Wright, Captain Galante, and other City leaders resented the union's activities under President Bergeson and actively worked to limit his role and stifle union activity. The following are examples of the retaliatory, disparate, and hostile treatment the Plaintiff was subjected to by virtue of his position as Union President

**SAILFEST AND CHIEF WRIGHT'S PUSH:**

25. In March of 2022, Plaintiff, in his capacity as Union President expressed concerns about the ability of the NLPD to adequately staff Sailfest and to ensure the safety of the hundreds of thousands of event participants. When his concerns were ignored, the Union, acting through the Plaintiff, recommended cancellation of the annual event due to their unaddressed public safety concerns.

26. Having received no meaningful response from Chief Wright and his leadership team, the Union, acting through the Plaintiff, sent a letter to Mayor Michael Passero and all members of the City Council explaining their concerns and recommending cancellation of the event due to the Department's staffing difficulties. Among the concerns expressed by the Union were:

   a. "The New London Police Union would like to express to the City and its administration that the police department does not have the staffing to support an event of this size to ensure the safety of the public and its officers. Our department is at an almost record low staffing level despite the City's efforts to hire officers." [See Exhibit B, Letter from Union dated March 22, 2022.]

   b. "In the past we have had large scale arrests of 10+ people and had objects thrown at officers and officers struck with glass bottles. Over the past eleven years the city has averaged 302 police calls for service, with 48 incident reports generated,

with a high of 400 police calls for service and 66 incident reports taken during the Sailfest weekend." [ID.]

27. After the Department and the City failed to address any of the Union's concerns, on May 11, 2022, the Union posted the letter on Facebook to inform the public of the anticipated safety risks.

28. In the days and weeks leading up to the event, the local media published the letter and ran news stories highlighting the safety concerns raised by the Union and the Plaintiff (in his capacity as Union President).

29. In the early morning hours of July 10, 2022, during what officers refer to as the "push" whereby the Sailfest crowd is disbursed and the area cleared at the conclusion of the night's festivities, Chief Wright grabbed a female civilian by the arm who was attempting to go through the line of police officers and subsequently pulled her off of several stairs in an effort to stop her movement. The female event participant was then arrested and charged with Disorderly Conduct. The event was witnessed by the Plaintiff, Defendant Galante, and the majority of NLPD officers. The resultant arrest report failed to make any mention of a use of force against the female.

30. As discussed *infra*, subsequent to Defendant Wright's 'push,' Plaintiff was disciplined for failing to report a use of force incident.

31. Defendant Galante completed the investigation of the Plaintiff's alleged use of force and noted "The physical contacts were significant enough to prevent (redacted) from moving in a direction he intended on and/or restricted his forward movement all together by causing him to step backwards. These contacts should have been further documented per department policy."

32. In response to questions regarding his alleged failure to report the August 2022 incident, Plaintiff explained that he did not believe the level of contact rose to the level/was serious enough to warrant a use of force report.

33. On May 30, 2023, the Chief Administrative Officer for the City of New London denied a Step 3 grievance filed by the Union on behalf of the Plaintiff concerning this issue.

34. After his defenses were rejected by Chief Administrative Officer Fields and Chief Wright, and after Captain Galante clarified the Department's new expansive definition of "use of force" it was clear to the Plaintiff that the July 10, 2022, incident involving Chief Wright was also reportable under this new standard.

35. On June 3, 2023, Plaintiff filed an interdepartmental memo, as required by General Order 11.6, reporting 'misconduct by superior officers,' and indicating that he believed both Chief Wright and Captain Galante violated General Order 4.70 when they failed to report and/or otherwise document the use of force incident.

**PLAINTIFF'S ALLEGED USE OF FORCE**

36. On August 20, 2022, Plaintiff was the assigned shift commander when he received a radio communication from another officer that two suspicious individuals were canvassing the police parking lot.

37. Plaintiff observed the individuals filming police vehicles, personal vehicles, and points of egress of the police station.

38. Based on this observation and with the knowledge that individuals had recently been arrested for trying to break into and steal police vehicles, Plaintiff instructed the individuals to exit the parking lot or come into the police lobby to carry out whatever police business they were there for.

39. The individual whom Plaintiff was directly speaking with refused to leave and taunted the Plaintiff, challenging him to place him under arrest.

40. It should be noted that this individual, Daniel Kokoszka, has been arrested by multiple police departments and found guilty of CGS §53a-167a - Interfering with an Officer, for behavior substantially similar to what he was doing at the New London Police Department on August 20, 2022.

41. The Plaintiff engaged in a verbal confrontation with the individual and used his body and arms to try and escort the individual off the parking lot.

42. After a short period of time the Plaintiff walked away and instructed other officers to monitor the activity of the individual and his companion.

43. At no point during Plaintiff's interaction with Kokoszka did Kokoszka complain of injuries, nor did Plaintiff attempt to restrain, injure, or arrest Kokoszka.

44. Following the encounter, Plaintiff documented the incident and requested that an arrest warrant be issued for the two individuals who refused to leave the parking lot and could provide no justification for why they were there or why they were filming the vehicles in the parking lot.

45. In the incident report prepared by Plaintiff, he noted "The bald male [Kokoszka] became argumentative with officers stating that he did not need to identify himself and that he did not need to give a reason why he was there.  The male was told multiple times that he now needed to leave the rear parking lot.  I attempted to remove the male several times but he pushed back against me and pushed around me.  Seeing that the situation was escalating and believing that any attempt to remove or identify the males would result in a potential use of force resulting in possible injury to the males or officers, I informed

officer to leave them.  I stepped back onto the landing above the rear lot and officers continued watching the males as they walked through the lot now videotaping the insides of police vehicle[s], as well as personal vehicles."

46. The arrest warrants applied for by the Plaintiff from this incident were denied

47. On October 1, 2022, Defendant Galante completed an Investigative Report of the August 20th incident.  As part of this investigation, Defendant Galante gathered and reviewed body worn camera footage from all officer witnesses, spoke with all involved officers, took taped statements, and performed several other investigative tasks.  The findings of his investigation determined that "The physical contacts were not egregious or excessive to the point of any visible injury.  At no point does Kokoszka appear and/or claim to be injured as a result of these physical contacts.  As such this writer finds the actions of Officer Sadowski and Officer Lewis who were the witnessing officers of these physical contacts to be reasonable.  Based upon the video and memorandums of both officers it is apparent that neither objectively believed the physical contacts were excessive or unreasonable as the physical contacts were an attempt by Lieutenant Bergeson to have Kokoszka simply leave the property."

48. Despite the findings as they relate to the witnessing officers, Defendant Galante reached a different conclusion concerning the Plaintiff.  "As for the actions of Lieutenant Bergeson, this writer does not find justification for the multiple physical contacts, which occurred with Kokoszka, while he was engaged in a constitutionally protected activity.  Kokoszka was not detained or under arrest and no reasonable articulable suspicion had been developed to indicate that he had committed or was about to commit a crime in the public space that is the rear parking lot of the New London Police Department."

49. At the conclusion of his report, Defendant Galante recommended a Supervisor's Complaint be issued against the Plaintiff for his failure to report the use of force and for conduct unbecoming an officer, with suspension, reduction in rank, and/or removal from office as possible disciplinary outcomes.

50. On December 13, 2022, Chief Wright sent letters to the complainant, Kokoszka, as well as the officers implicated in the investigation of the August 20th incident and noted that the allegations of "Assault on an individual / violation of rights" against the Plaintiff had been sustained.  [See Exhibit C, Letters from Chief Wright dated December 13, 2022.]

51. In this letter, Chief Wright falsely noted that allegations of 'Assault on an individual / Violation of Rights' against Lt. Bergeson were sustained by Captain Galante and that the Chief concurred with Galante's findings:

> The internal affairs investigation initiated by a complaint to the New London Police Department for an incident that occurred on August 20, 2022, has been conducted and concluded by Captain Matthew Galante.
>
> Allegations:    Assault on an Individual / Violation of Rights
>
> Officer(s) Complained Against – Findings:
>
> - Lieutenant Joshua Bergeson – Sustained
> - Detective Sergeant Ryan Linderson – Unfounded
> - Officer Michael Lewis – Unfounded
> - Officer Eric Sadowski – Unfounded
> - Lieutenant Lawrence M. Keating – Unfounded
>
> I have reviewed the investigation conducted by Captain Galante and concur with his findings.

[ID.]

52. The false, erroneous, and intentionally harmful statements of Chief Wright did in fact cause severe and irreparable harm to the Plaintiff and to his family.  Just days after this false letter was sent, Kokoszka, emboldened by Chief Wright's false statement, filed a criminal complaint against the Plaintiff.

53. On or around January 4, 2023, Plaintiff was informed that Kokoszka had filed criminal charges against him from the August 20th parking lot incident.

54. After being notified that he was under a criminal investigation, the Plaintiff began receiving anonymous death threats.  One male called the police department and threatened to kill Lt. Bergeson, his wife, and his children.  As a result of these threats, the NLPD and the State's Attorney's Office launched an investigation, and the State Police began doing patrol checks at the Plaintiff's residence.

55. On or around February 14, 2023, a pre-disciplinary hearing was held at which time the Plaintiff was informed that he had been cleared of the criminal charges.  At this meeting the Union challenged the Department's assertion in prior letters and disciplinary findings that the allegation of Assault against Lt. Bergeson had been sustained and also presented arguments that the incident was not a use of force and did not rise to the level of a reportable use of force based on past (and current) departmental practices.

56. On or around March 6, 2023, the Plaintiff received a Disciplinary Action Letter indicating that he would receive a three (3) day suspension and require additional training based on the August 20th incident.

57. On March 10, 2023, Plaintiff received a letter from State's Attorney Paul Narducci which was dated March 2, 2023, stating that his office had reviewed the Connecticut State Police investigation of the August 20th incident and determined that no violation of law occurred and that his office would not be taking any further action in relation to the incident.  [Exhibit D – Letter from State's Attorney Narducci dated March 2, 2023.]

58. The Defendants and the NLPD failed to include this exculpatory letter in Plaintiff's Internal Affairs file and failed to provide it to Attorney Rose when he was subsequently

enlisted to investigate Lt. Bergeson.  In fact, the first report prepared by Attorney Rose was so clearly based on a lack of complete information that it concluded that Lt. Bergeson should have been charged with assault for the August 20th incident.

59. On March 10, 2023, the Union filed a Step 1 Grievance, challenging the disciplinary decision of Chief Wright regarding the August 20th incident.

60. On or around March 29, 2023, the Union's Step 1 Grievance concerning Plaintiff's discipline from the August 20th incident was denied.

61. On or around April 2, 2023, the Union filed a Step 2 Grievance challenging the disciplinary decision of Chief Wright regarding the August 20th incident.

62. On or around April 11, 2023, Chief Wright denied the Union's Step 2 Grievance concerning Plaintiff's discipline from the August 20th incident.

63. On or around April 12, 2023, the Union filed a Step 3 Grievance challenging the disciplinary decision of Chief Wright regarding the August 20th incident.

64. On or around April 17, 2023, the Plaintiff and the Union met with Chief Administrative Officer Fields to discuss the issues with the alleged failure to report a use of force from the August 20th incident and requested that it be removed from the findings along with the inaccurate statement about the assault allegations against the Plaintiff being sustained. At the meeting, the Union proposed, as a compromise, that the Plaintiff receive discipline for 'conduct unbecoming an officer.'

65. On or around April 24, 2023, the Plaintiff and the Union met with Chief Wright and Captain Galante to discuss concerns with the standard for use of force reporting being used against the Plaintiff as well as to request a correction to the earlier letters and investigatory documents indicating that an allegation of assault had been sustained

against the Plaintiff.  At this meeting, the Union and the Plaintiff discussed the Department's problematic and new interpretation of use of force reporting and explained that under such an interpretation, the Chief's 'push' of a female on July 10, 2022, at Sailfest would also fall under this definition.

66. On or around April 24, 2023, the Plaintiff and the Union were served with a letter from Chief Wright correcting the earlier statements that a finding of assault had been sustained against Lt. Bergeson from the August 20, 2022, incident.

67. Just as in prior instances, neither the NLPD nor any of the Defendants added the April 24th letter to Lt. Bergeson's IA file, deciding against incorporating any exculpatory information that could benefit Lt. Bergeson or more accurately reflect the facts that were known at the time.  Similarly, the April 24th letter was never provided to Attorney Rose for his investigation of Lt. Bergeson, nor was the correction provided to the citizen complainant or the other officers who received the original false and misleading letter.

68. On or around May 30, 2023, the Plaintiff and the Union received a letter from Chief Administrative Officer Fields stating that the Step 3 Grievance challenging the disciplinary decision of Chief Wright concerning the August 20th incident had been denied.

69. With his stated concerns having been ignored or otherwise unaddressed, on June 3, 2023, Plaintiff filed an interdepartmental memo, as required by General Order 11.6, reporting 'misconduct by superior officers' and indicating that he believed both Chief Wright and Captain Galante violated General Order 4.70 when they failed to report and/or otherwise document the use of force incident.

**WORKPLACE VIOLENCE INCIDENT**

70. The City of New London has a stringent Workplace Violence Policy.  According to the policy, "The City has a ZERO TOLERANCE policy against any form of intimidation, threats or violence in the workplace.  All forms of intimidation, bullying, threats or violent acts are STRICTLY PROHIBITED."

71. The policy further states that "any employee who makes a threat, whether express or implicit, exhibits threatening behavior, or engages in any violent act or other violation of this policy on City property or otherwise in the course of their employment with the City, shall be removed from the premises as quickly as safety permits, and shall remain off City property pending the outcome of an investigation."

72. The Policy also contains a mandatory reporting provision which provides "All City personnel are responsible for notifying their supervisors, Department Head, the Chief Administrative Officer or the Mayor of any violation of this policy, including but not limited to any threats they have witnessed, received, or have been told that another person witnessed or received, whether by another employee or a visitor…All reports will be investigated fully and promptly by the Chief Administrative Officer, the City Attorney's Office or by a professional designee."

73. The Policy further provides that "The City's work premises, although open to the public, are restricted to individuals with a legitimate business purpose.  For the safety of all, any employee who observes any individual (including current or former employees) loitering, or present on the premises without an apparent business need to be there or otherwise interfering with the operations should contact their supervisors immediately to report the circumstance."

15

74. On April 25, 2023, an incident occurred at the New London Police Department wherein a male and female employee of the police department bumped into each other following an earlier verbal confrontation.

75. Following the incident, the female officer (hereafter "Officer 1") asked to speak to her direct supervisor (hereafter "Officer 2"). Officer 1 advised Officer 2 that she was upset by the incident, but she did not want to file a complaint. She described the physical contact as a 'bump' and indicated she just wanted someone to speak with the other officer. Officer 2 agreed to speak with him to address the issue.

76. Officer 2 attempted to speak to the other officer (hereafter "Officer 3") involved in the incident but was unable to do so on the date of the incident because Officer 3 was out of the building on an investigative assignment for the remainder of the day.

77.  On or around April 26, 2023, Captain Galante had a conversation with Officer 1 and after many questions was advised of the incident. At this time Officer 1 again indicated she did not want to file a formal complaint. An Internal Affairs investigation was initiated, however, after Captain Galante discussed the issue with Chief Wright.

78. Despite the explicit provisions of the City's policy regarding Workplace Violence, CAO Fields did not assume the investigation or assign the investigation to the City Attorney's Office or a professional designee of his choosing. Instead, Chief Wright assigned the investigation to Captain Galante without following the established and required procedures.

79. In further violation of the explicit provisions of the City's policy regarding Workplace Violence, neither Chief Wright nor the City removed the alleged aggressor from police property nor kept him out of work pending a complete investigation of the matter.

80. In the aftermath of the April 25th incident, several officers were interviewed, and both Officer 2 (the supervisor) and Officer 3 (the alleged aggressor) were disciplined.  The underlying incident, the manner in which it was investigated, and the conflicting justifications for disciplinary action all became the subject of multiple grievances, complaints, and further acts of retaliation by the Defendants.

81. On or around May 22, 2023, Officer 3 and Officer 2 were each served with a Supervisor's Complaint concerning the April 25th incident.  The Supervisor's Complaint initiated formal disciplinary proceedings against each individual.

82. In one of the Supervisor's Complaints authored by Defendant Galante, he noted "Although reported to be described as a bumping into initially to [Officer 2]  with no formal complaint requested, the incident involved two employees under his supervision involved in a heated verbal dispute with a subsequent physical contact between two of the involved parties.  If a Supervisor receives allegations of serious misconduct on the part of a Police Department employee, the Supervisor is required to notify the Chief of Police of same as soon as practically possible."

83. On or around June 12, 2023, a Pre-Disciplinary Hearing was held for Officer 2 and Officer 3.  At the Pre-Disciplinary Hearing, Officer 2 was accused of failing to report allegations of serious misconduct.

84. Given that Officer 2 was facing discipline for his failure to report a serious incident and given the explicit language of the City's Workplace Violence Policy, Defendant Wright and Defendant Galante were asked by President Bergeson why Officer 3 was not placed on leave and sent home when they learned of the incident and pending the outcome of the

17

investigation. To this inquiry, the Defendants responded that Officer 3 was not sent home because "the allegations were not serious."

85. At the Pre-Disciplinary Hearing on June 12, 2023, President Bergeson and the Union raised several questions about the manner in which the underlying incident was investigated and noted that it appeared that the female officers who were involved and/or witnessed the incident were not questioned in the same manner as the male officers and were not required to submit memorandums. To this allegation, the Defendants remained silent and provided no justification for their actions or clarification on the investigative steps undertaken. Additionally, the Union questioned the evidence reviewed by the Defendants in their investigation, pointing out that the video relied upon for purposes of the hearing was the wrong video. The video relied upon by Defendants was not from the correct time and the recording from the correct time of the incident was no longer available due to retention time policies.

86. In addition to concerns over the sloppiness of the investigation, the Union had significant questions and concerns about the Defendants' cherry-picking which provisions of the City's Workplace Violence Policy they chose to adhere to and/or apply. President Bergeson pointed out the blatant inconsistency in the Defendants application of the rules and interpretation of the language and asked how the incident could be serious on one hand – serious enough to discipline Officer 2 for failing to report it, but not serious enough for them to place the offending officer (Officer 3) on leave and send him home pending the investigation.

87. Based on the Union's concerns with the Defendants' manipulation of the disciplinary process, the investigative errors, the selective enforcement of policies and the willful

disregard of others, President Bergeson filed grievances and requested that the Department rescind the Supervisor's Compliant and issue Officer 2 a Formal Apology Letter.

88. On or about June 26, 2023, the Union filed grievances against Chief Wright and Captain Galante for violations of the City's Workplace Violence Policy as well as a grievance alleging gender discrimination for the City's alleged failure to request memorandums from the female officers who were involved with and/or witnessed the April 25th incident.

89. On July 3, 2023, Officer 2 received notice that the Supervisor's Complaint previously issued to him was rescinded and he would instead receive a Supervisor's Observation Report ("SOR").

90. On July 3, 2023, Officer 3 received notice that he would receive a one-day suspension held in abeyance for violating the Workplace Violence Policy.

91. Under the terms of the Collective Bargaining Agreement as well as the policies and practices of the City and the Police Department, an SOR remains in an officer's personnel file and can't be challenged.  While the SOR cannot be challenged, it can still have negative consequences for the officer as it remains a part of his or her record.

92. On July 4, 2023, the Union, acting through President Bergeson, filed step-one grievances on behalf of the two officers who were subjected to disciplinary action.  On the same date, and only after the Defendants formally disciplined the officers and thereby ignored the Union's concerns, President Bergeson filed multiple complaints with the Mayor's Office against Chief Wright for violating the Workplace Violence Policy.  Additionally, due to the factual inconsistencies and divergent analysis of the same, the Union filed a

complaint with the Mayor's Office against Chief Wright for entering false information on the record regarding Officer 2's SOR.

93. In a departure from protocol and before providing any response to the Union's allegation of gender discrimination, on July 5, 2023, Defendant Galante filed a complaint against the Plaintiff with Defendant Wright alleging untruthfulness regarding the Union's gender discrimination grievance.

94. On or about July 11, 2023, Chief Wright filed a complaint against President Bergeson with the Mayor's Office related to Captain Galante's complaint.

95. On or about July 11, 2023, Chief Wright filed another complaint against President Bergeson with the Mayor's Office alleging harassment, intimidation, hostile work environment, and untruthfulness.

96. On July 12, 2023, before providing any response to the Union's allegation of gender discrimination, President Bergeson was served with a letter from Chief Wright indicating that Bergeson was under investigation. Oddly and in direct violation of Department policy, this letter failed to specify the nature of the allegations or provide any information concerning the reason for the investigation.

97. On Thursday July 13, 2023, the Union received a step-one response and denial of the grievance alleging gender discrimination. The City's step-one response contained no explanation as to why Chief Wright and Captain Galante failed to clarify the record concerning the investigative steps at the June 12th hearing nor did it address why the decision was made to aggressively pursue discipline of President Bergson before even responding to the grievance or clarifying the investigative steps taken to obtain statements from the female officers.

20

98. Also on July 13, 2023, Plaintiff received a new letter from Chief Wright indicating that Bergeson was under investigation for untruthfulness related to the gender discrimination grievance filed by the Union. The allegation of untruthfulness and or False Statement made against Lt. Bergeson was ultimately sustained by the Defendants.

99. On Monday July 17, 2023, after a review of the City's response and a determination that the gender discrimination complaint was not warranted based on the clarification provided in the response, President Bergeson and the Union promptly rescinded the grievance.

## RETALIATION/HARRASMENT COMPLAINTS

100. Determined to exploit the opportunity to chill union activity and retaliate against President Bergeson, Internal Affairs Investigation 2023-08 was launched against the Plaintiff based on allegations that he violated the city's harassment and discrimination policy, untruthfulness, and respect and courtesy.

101. On or around July 17, 2023, the Union was informed that Attorney Michael Rose would be investigating the complaints/grievances filed by the Union and/or Plaintiff against the Defendants as well as those complaints/allegations made by the Defendants against President Bergeson.

102. Attorney Rose previously defended the City and former New London Police Department Chief Margaret Ackley against allegations of union interference and retaliation.  (See Todd Lynch v. Margaret Ackley, and the City of New London, United States District Court for the District of Connecticut, 3:12-cv-00537).  Based on this obvious conflict and believing that Attorney Rose would not conduct a fair and impartial

21

investigation, on July 21, 2023, the Union sent an email to CAO Fields objecting to Attorney Rose's involvement in the investigation and requesting another attorney.

103.    The very next business day, on July 24, 2023, CAO Fields summarily dismissed the concerns of the Union and rejected the objection to Attorney Rose.  Going forward, Attorney Rose defended the City and the Police Department from the allegations made by President Bergeson and the Union, while carrying out preemptive attacks and punishments against Bergeson.

104.    Throughout the City's investigation of Lt. Bergeson and the Union, which was led by Attorney Rose, Lt. Bergeson was required to participate in the investigation and answer questions and provide documents concerning union activities and his past behavior.  Such participation was provided under the threat of further retaliation by the City and the Defendants.

## UNION COMPLAINT

105.    On July 25, 2023, the Union filed a Municipal Prohibitive Practices (MPP) Complaint against the City for investigating protected union activity.  [See Exhibit E, Municipal Prohibited Practices Complaint filed July 25, 2023.]  The Union alleged that the City of New London, acting through Chief Wright, was actively violating the Municipal Employee Relations Act.  In support of this conclusion, the Union explained:

   a.  On June 3, 2023, Lt. Bergeson filed a complaint and grievance against Police Chief Wright regarding a use of force incident that occurred during the 2022 Sail Fest.  Also, between June 10, 2023, and July 17, 2023, Union President Bergeson files three more grievances with Chief Wright.

b. On July 17, 2023, Union President Lt. Bergeson was notified by the City CAO Steven Fields that he was the subject of an internal affairs complaint regarding New London's Harassment and Discrimination Policy, General Order Respect and Courtesy, and Truthfulness.

c. On July 19, 2023, Attorney Michael Rose (the City's investigator for the investigations(s)) provided Chief Wright's complaint to the Union, which was filed with CAO Fields on July 11, 2023.

d. The Chief's complaints clearly state that Union President Bergeson was acting in his capacity as union president during the incidents he is complaining about and the grievances that are being filed.

e. They City and the Chief are retaliating against Union President Lt. Bergeson, interfering with Local 724, and are violating MERA by conducting internal investigation(s) into Union activity.

106. Chief Wright, Captain Galante and the City's efforts to retaliate against President Bergeson, interfere with Union activity, and stomp out any questioning of Chief Wright's management practices continued into the Fall of 2023, with their sights now set on ousting Lt. Bergeson as Union President.

**SUSPENSION/ELECTION INTERFERENCE**

107. Union leaders are elected by members of the Union every two years, to serve two-year terms.

108. President Bergeson decided to run for re-election. The Union elections were scheduled to occur on November 10, 2023.

109.     On September 29, 2023, Union President Bergeson was placed on administrative leave pending a pre-disciplinary hearing originally scheduled for November 2, 2023.

110.     Prior to notifying President Bergeson of the administrative leave, his access to departmental computers and email was cut off.  Immediately thereafter, his access to the building was restricted.

111.     As part of his administrative suspension and in an effort to stifle his ability to communicate with union members and discuss the pending election, update union members on recent activity, and/or lay out his vision for the next two years, President Bergeson was prohibited from being on Police Department grounds during his suspension.

112.     As part of his administrative suspension, and in an effort to stifle his ability to communicate effectively with union members and to fulfil his responsibilities as Union President, President Bergeson's access to his departmental email was cut off.

113.     On or around October 13, 2023, a union meeting was held in order to nominate candidates for the various positions that would be voted for on November 10, 2023.

114.     Due to the terms of President Bergeson's suspension, this union meeting did not occur at the Police Department but was instead held at a Holiday Inn.

115.     President Bergeson was nominated for the position of Union President along with another candidate, Brian Laurie ("Laurie").  Laurie was and is a close friend of Captain Galante.

116.     Between the date of President Bergeson's suspension and the Union election, rumors swirled around the Police Department about the suspension.  Members were unsure of the basis for Plaintiff's suspension and equally unsure if he would be allowed

to return.  Members raised questions about what would happen if Bergeson was re-elected and then terminated.  Meanwhile, President Bergeson was forced to stay away from the Department and was unable to respond to the rumors.

117.    As a result of the Defendants' retaliatory actions against President Bergeson, he was not re-elected Union President.

118.    On February 21, 2024, after being placed on administrative suspension for one hundred and fifty-one (151) days, Lt. Bergeson received notice that he could return to work the following week.

119.    Following the lengthy administrative suspension and 'investigation,' Lt. Bergeson received only a three (3) day suspension which was held in abeyance.

## COUNT ONE: VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983 – CITY OF NEW LONDON (FIRST AMENDMENT RIGHTS)

120.    Paragraphs 1 through 119 of the Complaint are hereby incorporated as Paragraphs 1 through 119 of Count One as if fully set forth herein.

121.    At all relevant times herein, Defendant Wright, as Chief of Police, was an agent, servant, and/or employee of the Co-Defendant City of New London and acted as the full and final decision and policy maker in matters related to the police department of the City of New London.

122.    The City of New London, by and through its decision and policy maker Chief Wright, as set forth in the preceding paragraphs, retaliated and disciplined the Plaintiff by way of adverse employment actions against him in violation of 42 USC §1983 and deprived Plaintiff of his First Amendment rights of freedom of association and freedom of speech, and his Fourteenth Amendment right of privacy.

25

123.     In addition to interfering with Plaintiff's First Amendment rights, the conduct of Defendant City interfered with the Plaintiff's contractual rights as set forth in the Agreement.

124.     As a direct and proximate result of the conduct of Defendant City of New London, Plaintiff has suffered damages for violations of his First Amendment rights by way of monetary compensation, pecuniary loss, punitive damages, reputational harm, emotional distress and attorney's fees for which the Defendant is liable.

## COUNT TWO: VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983 – BRIAN WRIGHT  (FIRST AMENDMENT RIGHTS)

125.     Paragraphs 1 through 124 of Count One are hereby incorporated as Paragraphs 1 through 124 of Count Two as if fully restated herein.

126.     The retaliatory conduct by Defendant Wright as aforesaid was intended to create a continuing chilling effect on the Plaintiff's free speech and association rights and has caused a constant and justifiable fear of reprisal that continues to this day.

127.     In addition to interfering with Plaintiff's First Amendment rights, the conduct of Defendant Wright interfered with the Plaintiff's contractual rights as set forth in the Agreement.

128.     The retaliatory conduct by Defendant Wright as aforesaid was under color of law, custom, and usage and by the authority given to him by state law in his capacity as Chief of Police and was in violation of 42 USC §1983.

129.     As a direct and proximate result of the conduct of Defendant Wright, Plaintiff has suffered and continues to suffer damages for violations of his First Amendment rights by

way of monetary compensation, pecuniary loss, punitive damages, reputational harm, emotional distress and attorney's fees for which the Defendant is liable.

## COUNT THREE: CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS (FIRST AMENDMENT) PURSUANT TO 42 U.S.C. §1985(3) – ALL DEFENDANTS

130.     Paragraphs 1 through 129 of County Two are hereby incorporated as Paragraphs 1 through 129 of Count Three as if more fully set forth herein.

131.     Through the conduct alleged herein, the Defendants acted in concert to silence the Plaintiff and to prevent the exercise of his free speech and association rights.

132.     The actions were taken with the purpose of chilling union activity and silencing the Plaintiff through fear of retaliation and unjustified adverse employment actions.

133.     Through the conduct alleged herein, the Defendants acted in concert to subject the Plaintiff to disparate treatment and consistently misapplied rules and procedures against the Plaintiff and the members of the police union in manners that were inconsistent with their interpretation of the rules as they applied to themselves.

134.     The concerted actions of the Defendants were the byproduct of an agreement, either explicit or implied, to silence the Plaintiff and stop the Union from questioning their management practices and compliance with the Collective Bargaining Agreement.

135.     As a direct and proximate result of the conduct of the Defendants, Plaintiff has suffered and continues to suffer damages for violations of his First Amendment rights by way of monetary compensation, pecuniary loss, punitive damages, reputational harm, emotional distress and attorney's fees for which the Defendant is liable.

## COUNT FOUR: VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS (RIGHT TO CONTRACT) PURSUANT TO 42 U.S.C. §1983 – CITY OF NEW LONDON

136.    Paragraphs 1 through 135 of Count Three are hereby incorporated as Paragraphs 1 through 135 of Count Four as if more fully set forth herein.

137.    At all relevant times herein, Defendant Wright, as Chief of Police, was an agent, servant, and/or employee of the Co-Defendant City of New London and acted as the full and final decision and policy maker in matters related to the police department of the City of New London.

138.    The City of New London entered into a collective bargaining agreement with the Union covering the periods of July 1, 2021 through June 30, 2024.

139.    Pursuant to Section 9.2 of the Agreement, "The City and the Union shall recognize and adhere to all provisions of laws, ordinances, the policy manual and personnel rules and regulations not otherwise superseded by the terms of this Agreement."

140.    The policy manual sets forth the General Orders which govern the conduct of police officers and department personnel.

141.    In the Agreement, the City agreed that Officers would be protected from discipline if they followed the policies, practices and procedures as delineated in the General Orders and Plaintiff was a member of that protected class.

142.    Both as a member of the Union and as the President of the Union, Plaintiff was vested with rights, protections and obligations pursuant to the terms of the CBA.

143.    By the conduct alleged herein, Defendant City of London, acting by and through its agents, servants and/or employees including but not limited to Chief Wright, Captain

28

Galante, Mayor Michael Passero, and Chief Administrative Officer Steven Fields disregarded and violated the terms of the Agreement when subjecting the Plaintiff to unfair and unjustified disciplinary action.

144.    By violating the terms of the Agreement, Defendant City of New London illegally and unconstitutionally interfered with the Plaintiff's contractual rights in violation of the United States Constitution, the Connecticut State Constitution, and 42 U.S.C. §1983.

145.    As a direct and proximate result of the conduct of the Defendants, Plaintiff has suffered and continues to suffer damages for violations of his contractual rights by way of monetary compensation, pecuniary loss, punitive damages, reputational harm, emotional distress and attorney's fees for which the Defendant is liable.

## COUNT FIVE: VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS (RIGHT TO CONTRACT) PURSUANT TO 42 U.S.C. §1983 – BRIAN WRIGHT

146.    Paragraphs 1 through 145 of Count Four are hereby incorporated as Paragraphs 1 through 145 of Count Five as if more fully set forth herein.

147.    At all relevant times herein, Defendant Wright, as Chief of Police, was an agent, servant, and/or employee of the Co-Defendant City of New London and acted as the full and final decision and policy maker in matters related to the police department of the City of New London.

148.    The retaliatory conduct by Defendant Wright as aforesaid was under color of law, custom, and usage and by the authority given to him by state law in his capacity as Chief of Police and was in violation of 42 USC §1983.

149.    The City of New London entered into a collective bargaining agreement with the Union covering the periods of July 1, 2021 through June 30, 2024.

150. Pursuant to Section 9.2 of the Agreement, "The City and the Union shall recognize and adhere to all provisions of laws, ordinances, the policy manual and personnel rules and regulations not otherwise superseded by the terms of this Agreement."

151. The policy manual sets forth the General Orders which govern the conduct of police officers and department personnel.

152. In the Agreement, the City agreed that Officers would be protected from discipline if they followed the policies, practices and procedures as delineated in the General Orders and Plaintiff was a member of that protected class.

153. Both as a member of the Union and as the President of the Union, Plaintiff was vested with rights, protections and obligations pursuant to the terms of the CBA.

154. By the conduct alleged herein, Defendant Wright, acting under color of law, disregarded and violated the terms of the Agreement when subjecting the Plaintiff to unfair and unjustified disciplinary action.

155. By violating the terms of the Agreement, Defendant Wright illegally and unconstitutionally interfered with the Plaintiff's contractual rights in violation of the United States Constitution, the Connecticut State Constitution, and 42 U.S.C. §1983.

156. As a direct and proximate result of the conduct of the Defendants, Plaintiff has suffered and continues to suffer damages for violations of his contractual rights by way of monetary compensation, pecuniary loss, punitive damages, reputational harm, emotional distress and attorney's fees for which the Defendant is liable.

**COUNT SIX: CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS (RIGHT TO CONTRACT) PURSUANT TO 42 U.S.C. §1985(3) – ALL DEFENDANTS**

157.    Paragraphs 1 through 156 of Count Five are hereby incorporated as Paragraphs 1 through 156 of Count Six as if more fully set forth herein.

158.    Through the conduct alleged herein, the Defendants acted in concert to silence the Plaintiff and to interfere with and or prevent his enjoyment of his contractual rights.

159.    The City of New London entered into a collective bargaining agreement with the Union covering the periods of July 1, 2021 through June 30, 2024.

160.    Pursuant to Section 9.2 of the Agreement, "The City and the Union shall recognize and adhere to all provisions of laws, ordinances, the policy manual and personnel rules and regulations not otherwise superseded by the terms of this Agreement."

161.    The policy manual sets forth the General Orders which govern the conduct of police officers and department personnel.

162.    In the Agreement, the City agreed that Officers would be protected from discipline if they followed the policies, practices and procedures as delineated in the General Orders and Plaintiff was a member of that protected class.

163.    Both as a member of the Union and as the President of the Union, Plaintiff was vested with rights, protections and obligations pursuant to the terms of the CBA.

164.    By the conduct alleged herein, Defendants entered into an agreement with each other and with others, including but not limited to Mayor Michael Passero and Chief Administrative Officer Steven Fields to violate the terms of the Agreement when subjecting the Plaintiff to unfair and unjustified disciplinary action and otherwise retaliating against him for his role as Union President.  Such actions were taken under color of law.

31

165.    By violating the terms of the Agreement, Defendants conspired to illegally and unconstitutionally interfere with the Plaintiff's contractual rights in violation of the United States Constitution, the Connecticut State Constitution, and 42 U.S.C. §§ 1983 and 1985(3).

166.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff has suffered and continues to suffer damages for violations of his contractual rights by way of monetary compensation, pecuniary loss, punitive damages, reputational harm, emotional distress and attorney's fees for which the Defendant is liable.

## COUNT SEVEN: VIOLATION OF CONNECTICUT GENERAL STATUTES § 31-51q – ALL DEFENDANTS

167.    Paragraphs 1 through 166 of Count Six are hereby incorporated as Paragraphs 1 through 166 of Count Seven as if more fully set forth herein.

168.    As set forth in the facts of this Complaint, Plaintiff exercised his rights under the First Amendment to the United States Constitution and under Article First, §§ 3, 4 and/or 14 of the Connecticut Constitution.

169.    Plaintiff exercised his constitutionally protected rights by engaging in union activity and filing grievances against the Defendants.  This conduct constitutes activity protected by the First Amendment and/or Article First of the Connecticut Constitution.

170.    The ability to engage in the protected activity described herein, constituted an essential component of Plaintiff's duties and responsibilities as Union President.

171.    The Defendants were aware of Plaintiff's protected activity.

172.    After engaging in protected activity, Defendants subjected the Plaintiff to adverse employment action in the form of administrative suspensions and other conduct as set

forth in this Complaint.  These retaliatory and illegal adverse actions were motivated by Plaintiff's exercise of his constitutional rights.

173.     The conduct of the Defendants violated the Plaintiff's rights under Connecticut General Statutes § 31-51q.

174.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to loss of wages and benefits, emotional distress, damage to reputation, and other economic and non-economic losses.

## COUNT EIGHT: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – ALL DEFENDANTS

175.     Paragraphs 1 through 174 of Count Seven are incorporated herein and made Paragraphs 1 through 174 of Count Eight as if fully set forth herein.

176.     Through the facts alleged herein, the City of New London through its agents, servants, and/or employees including but not limited to Chief Wright, Captain Galante, Mayor Michael Passero, and Chief Administrative Officer Steven Fields, engaged in intentional infliction of emotional distress.

177.     The actions of the Defendants leading up to and including the suspension of the Plaintiff and the decision to sustain False Statement allegations were in blatant disregard to and/or contravention of policies, contracts, customs, well established best practices, and common sense.

178.     The actions of the Defendants as alleged herein were extreme and outrageous.

179.    The Defendants knew or should have known that the disciplinary actions taken against the Plaintiff were likely to result in the Plaintiff sustaining substantial financial losses, reputational harm and were otherwise likely to result in emotional distress.

180.    The extreme and outrageous conduct of the Defendants was intended to and has caused Plaintiff severe emotional distress.

181.    The outrageous conduct of the Defendants was intended to cause and did cause Plaintiff humiliation, disassociation with his colleagues at the New London Police Department, isolation, duress, embarrassment, emotional pain and suffering, physical pain and suffering, loss of enjoyment of life's activities, harm to his reputation and disassociation by his friends.

182.    As a result of the outrageous conduct of the Defendants, Plaintiff has sustained economic losses, pecuniary loss, reputational harm, and emotional distress.

## COUNT NINE: TORTIOUS INTERFERENCE WITH PLAINTIFF'S CONTRACTUAL RELATIONSHIP – CHIEF WRIGHT

183.    Paragraphs 1 through 182 of Count Eight are incorporated herein and made Paragraphs 1 through 182 of Count Nine as if more fully set forth herein.

184.    At all relevant times, Plaintiff, through his Union, had a valid and enforceable contract with the City of New London.

185.    Defendant Wright was aware, or should have been aware, of the existence of this contractual relationship between the Plaintiff and the City of New London.

186.    Despite having knowledge of the existing contract, Defendant Wright intentionally and improperly interfered with the contractual relationship between the

Plaintiff and the City by engaging in acts designed to disrupt, hinder, avoid, and/or ignore certain provisions of the contract which were intended to protect the Plaintiff.

187. Defendant Wright's actions were undertaken with the specific intent of interfering with Plaintiff's contractual relationship, or with reckless disregard for the consequences of his actions upon Plaintiff's rights.

188. As set forth in the allegations of this Complaint, Defendant Wright's interference was improper and unlawful in that it was motivated by malice and/or carried out using improper means.

189. As a direct and proximate result of Defendant Wright's intentional and improper interference, Plaintiff's contract with the City of New London was adversely affected and his rights pursuant to the contract were violated.

190. As a result of Defendant Wright's tortious interference, Plaintiff has suffered damages, including, but not limited to, loss of contractual benefits, economic loss, and reputational harm.

191. As a result of Defendant Wright's tortious interference, Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

192. In addition, Defendant Wright's conduct was willful, wanton, and malicious, entitling the Plaintiff to an award of punitive damages.

## COUNT TEN: TORTIOUS INTERFERENCE WITH PLAINTIFF'S CONTRACTUAL RELATIONSHIP – CAPTAIN GALANTE

193. Paragraphs 1 through 192 of Count Nine are incorporated herein and made Paragraphs 1 through 192 of Count Ten as if more fully set forth herein.

194. At all relevant times, Plaintiff, through his Union, had a valid and enforceable contract with the City of New London.

195. Defendant Galante was aware, or should have been aware, of the existence of this contractual relationship between the Plaintiff and the City of New London.

196. Despite having knowledge of the existing contract, Defendant Galante intentionally and improperly interfered with the contractual relationship between the Plaintiff and the City by engaging in acts designed to disrupt, hinder, avoid, and/or ignore certain provisions of the contract which were intended to protect the Plaintiff.

197. Defendant Galante's actions were undertaken with the specific intent of interfering with Plaintiff's contractual relationship, or with reckless disregard for the consequences of his actions upon Plaintiff's rights.

198. As set forth in the allegations of this Complaint, Defendant Galante's interference was improper and unlawful in that it was motivated by malice and/or carried out using improper means.

199. As a direct and proximate result of Defendant Galante's intentional and improper interference, Plaintiff's contract with the City of New London was adversely affected and his rights pursuant to the contract were violated.

200. As a result of Defendant Galante's tortious interference, Plaintiff has suffered damages, including, but not limited to, loss of contractual benefits, economic loss, and reputational harm.

201. As a result of Defendant Galante's tortious interference, Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

202.     In addition, Defendant Galante's conduct was willful, wanton, and malicious, entitling the Plaintiff to an award of punitive damages.

## COUNT ELEVEN: LIBEL PER SE (DEFENDANT WRIGHT)

203.     Paragraphs 1 through 202 of Count Ten are incorporated herein and made Paragraphs 1 through 202 of Count Eleven as if more fully set forth herein.

204.     Plaintiff further alleges that the allegations contained herein are reckless, malicious, and support a pattern of extreme and outrageous conduct by Defendant Wright against the Plaintiff which he has engaged in, instigated, and directed with the intention of causing or with reckless disregard of the probability of causing emotional distress to the Plaintiff.

205.     Defendant Wright's December 13th Letter (see Exhibit C) is defamatory and false in that it states that allegations of "assault on a person / violation of rights" were sustained against the Plaintiff.  This statement and Defendant Wright's conscious disregard of the truth were calculated to cause injury and damage to the Plaintiff and impugn his reputation.

206.     Said statement is libelous on its face by virtue of its false and defamatory and malicious nature and its intent to harm the Plaintiff and his reputation with the public.

207.     As a direct and proximate result of the conduct of Defendant Wright, Plaintiff has suffered injury and damage to his reputation as a Police Officer and has impeded his abilities before the public and as to future employment to which the Defendant is liable.

**WHEREFORE**, the Plaintiff claims:

1. Compensatory damages.

2. Punitive damages.

3. Damages and attorney's fees under 42 USC § 1983.

4. Such other relief as law or equity permits.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby requests a jury trial on all triable issues of fact raised by this Complaint.

THE PLAINTIFF,

By_/s/_(ct12299)_____
Jeffery L. Ment, Esq.
Patrick B. Jennings, Esq.
The Ment Law Group, PC
225 Asylum Street, 15th Floor
Hartford, CT 06103
(860) 969-3200
jment@mentlaw.com
pjennings@mentlaw.com