**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSHUA BERGESON, | ) | |
| *Plaintiff*, | ) | CASE NO. 3:25-CV-82 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CITY OF NEW LONDON, BRIAN WRIGHT, | ) | |
| and MATTHEW GALANTE, | ) | |
| *Defendants*. | ) | MARCH 30, 2026 |
| | ) | |

**MEMORANDUM OF DECISION**
**RE: DEFENDANTS' MOTION TO DISMISS (ECF NO. 21)**

Kari A. Dooley, United States District Judge:

Plaintiff Joshua Bergeson brings this action against Defendants City of New London, New London Police Department ("NLPD") Chief Brian Wright, and NLPD Captain Matthew Galante (collectively, "Defendants"), broadly alleging that Defendants, acting in concert, deprived Plaintiff of his free speech and associational rights under the First Amendment. *See* Complaint ("Compl."), ECF No. 1. Plaintiff brings claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1985 ("Section 1985"), Conn. Gen Stat. § 31-51q ("Section 31-51q"), and Connecticut common law. On April 4, 2025, Defendants filed the instant Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* MTD, ECF No. 21. Plaintiff opposes the Motion. *See* Pl. Opp., ECF No. 28. For the reasons that follow, Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part**.

**Allegations**

The Court assumes the parties' familiarity with the allegations and circumstances underlying this case, and recites herein only those relevant to the adjudication of the instant Motion to Dismiss.

In 2007, Plaintiff was hired as a police officer with the NLPD.  Compl. at ¶ 9.  Most recently, in 2022, Plaintiff was promoted to his current rank of Lieutenant.  *See id.* at ¶ 13.  At all relevant times, Defendant Wright was the Chief of Police, and Defendant Galante was a Captain. *See id.* at ¶¶ 6–7.

In 2021, Plaintiff was elected as President of the New London Police Union, Local 724 (the "Union").  *Id.* at ¶ 19.  Plaintiff sought election due to the "troubling dysfunction of the NLPD"—to include numerous state and federal lawsuits alleging, *inter alia*, discrimination, hostile work environment, and civil rights violations—and the intense scrutiny from local journalists that followed.  *See id.* at ¶¶ 17–18.  As Union President, Plaintiff was tasked with enforcing and upholding the Collective Bargaining Agreement ("CBA") between the NLPD and the Union; advocating for officers during disciplinary meetings; voicing officers' concerns; and serving as an intermediary between officers and the higher-ranking staff.  *Id.* at ¶ 22.  Union leaders are elected every two years and serve two-year terms.  *Id.* at ¶ 107.

Defendant Chief Wright, Defendant Captain Galante, and other City of New London leaders resented the Union's activities under Plaintiff's leadership, and "actively worked to limit [Plaintiff's] role and stifle union activity," as set forth below.  *Id.* at ¶ 24.

Sailfest

In March 2022, acting on behalf of the Union, Plaintiff expressed concerns regarding the NLPD's ability to adequately staff the upcoming "Sailfest," an annual summer event held in New London.  *Id.* at ¶ 25.  When these concerns were ignored by Defendant Wright and other NLPD leadership, the Union, acting through Plaintiff, wrote a letter to New London Mayor Michael Passero (the "Mayor") and other members of the City Council explaining its staffing concerns and ultimately recommending that the event be cancelled (the "Sailfest Letter").  *Id.* at ¶ 26.  After

such concerns continued to be ignored, the Union posted the Sailfest Letter on Facebook, in an effort "to inform the public of the anticipated safety risks." *See id.* at ¶ 27.  The Sailfest Letter was also published by the media in the days leading to the event, with news stories highlighting the safety concerns raised by the Union.  *Id.* at ¶ 28.

Sailfest occurred as scheduled on July 10, 2022.  *Id.* at ¶ 29.  The event concluded with what NLPD officers refer to as the "push," whereby the crowd is disbursed, and the area is cleared following the event.  *Id.*  On this occasion, during the push, Defendant Wright grabbed a female civilian by the arm in order to prevent her from moving through a line of police officers, and arrested her for disorderly conduct.  *Id.*  This event was witnessed by Plaintiff, Defendant Galante, and other NLPD officers.  *Id.*  Yet, no mention was made of Defendant Wright's use of force in the related arrest report.  *Id.*

On June 3, 2023, in light of the NLPD's "new expansive definition of 'use of force,'" as well as certain additional developments (discussed in further detail below), Plaintiff filed an interdepartmental memorandum, as required by General Order 11.6, stating that he believed both Defendant Wright and Defendant Galante violated General Order 4.70 when they failed to report and/or otherwise document the use of force incident from Sailfest.  *Id.* at ¶ 35.

Plaintiff's Alleged Use of Force

On August 20, 2022, Plaintiff was alerted that two suspicious individuals were present at and canvassing the NLPD police station.  *Id.* at ¶ 36.  Upon joining other officers at the scene, Plaintiff instructed the individuals to exit the parking lot, which led to a verbal altercation between one of the individuals and Plaintiff.  *Id.* at ¶¶ 38–41.  During this altercation, Plaintiff used his body in an attempt to guide the individuals off of the premises.  *Id.* at ¶ 41.  Neither individual was arrested, nor did the individuals report any injuries during or after the incident.  *Id.* at ¶¶ 41–43.

On October 1, 2022, Defendant Galante completed an investigative report into the foregoing incident. *See id.* at ¶ 47. Defendant Galante concluded that while the physical contacts used by the other officers involved were "not egregious or excessive," Plaintiff's physical contacts with one of the individuals lacked justification and occurred while the individual was engaged in a "constitutionally protected activity." *Id.* at ¶ 48. As such, Defendant Galante recommended that Plaintiff be disciplined for "his failure to report his use of force [and] conduct unbecoming of an officer, with suspension, reduction in rank, and/or removal from office as possible disciplinary outcomes." *Id.* at ¶ 49. On December 13, 2022, Defendant Wright agreed with Defendant Galante's findings, and stated in a letter sent to both the complaining civilian individual and the officers involved (the "December 13th Letter") that the "allegations of 'Assault on an individual/Violation of Rights' against [Plaintiff] were sustained." *Id.* at ¶¶ 50–51.

As a result of this "false letter," the individual filed a criminal complaint against Plaintiff. *Id.* at ¶ 52. Plaintiff and his family also received various anonymous death threats. *See id.* at ¶ 54. Following a pre-disciplinary hearing in February 2023, Plaintiff was cleared of all criminal charges. *Id.* at ¶ 55. Nevertheless, on March 6, 2023, Plaintiff was informed by the NLPD that as a result of his conduct on August 20, 2022, he would be required to serve a three-day suspension and require additional training. *Id.* at ¶ 56.

On March 10, 2023, Plaintiff received a letter from the State's Attorney's Office indicating that it had determined Plaintiff did not violate the law on August 20, 2022, and that no further action would be taken in relation to that incident. *Id.* at ¶ 57. That same day, and continuing through April 2023, the Union filed grievances regarding Chief Wright's disciplinary decision. *See id.* at ¶¶ 59–63.

Plaintiff and the Union also met with Chief Administrative Officer ("CAO") Fields, as well as Defendants Wright and Galante, in an attempt to resolve the dispute whereby, *inter alia*, certain corrections would be made regarding the description of Plaintiff's conduct on August 20, 2022. *See id.* at ¶¶ 64–65. To that end, on April 24, 2023, Defendant Wright provided a letter to the Plaintiff and the Union correcting the statements made in the December 13th Letter, regarding the "sustained" allegations of assault against Plaintiff. *Id.* at ¶ 66.

Workplace Violence Incident

On April 25, 2023, an incident occurred at the NLPD wherein a male and female employee bumped into each other following an earlier verbal confrontation. *Id.* at ¶ 74. Defendant Galante and Defendant Wright initiated an Internal Affairs investigation. *Id.* at ¶ 77.

During the course of the investigation, Plaintiff, in his capacity as Union President representing several of the officers involved, raised questions regarding the manner of the investigation and the evidence being relied upon, and specifically expressed concerns about Defendants "cherry picking" and/or violating various portions of the City of New London's Workplace Violence Policy, and otherwise manipulating the disciplinary process. *Id.* at ¶¶ 85–87. On July 4, 2023, the Union, acting through Plaintiff, filed grievances on behalf of the two officers who were ultimately disciplined as a result of the NLPD's investigation. *Id.* at ¶ 92. The Union also filed complaints with the Mayor's Office against Defendant Wright, specifically regarding his handling of the investigation. *Id.*

In turn, on July 11, 2023, Defendants Wright and Galante filed complaints with the Mayor's Office against Plaintiff, as Union President, alleging untruthfulness in the foregoing grievances, as well as for harassment, intimidation, hostile work environment, and untruthfulness. *Id.* at ¶¶ 93–95. The next day, Defendant Wright informed Plaintiff that he was under

investigation, without "specify[ing] the nature of the allegations or provid[ing] any information concerning the reason for the investigation."  *Id.* at ¶ 96.  On July 13, 2023, after one of the grievances filed by Plaintiff was denied, Defendant Wright sent Plaintiff another letter advising that he was under investigation for untruthfulness in such grievance.  *Id.* at ¶ 97–98.

Retaliation/Harassment Complaints

"Determined to exploit the opportunity to chill union activity and retaliate against [Plaintiff]," an Internal Affairs investigation was launched against Plaintiff based on allegations "that he violated New London's harassment and discrimination policy, untruthfulness, and respect and courtesy."  *Id.* at ¶ 100.  Attorney Michael Rose was responsible for investigating both the complaints filed by the Union and Plaintiff against Defendants, as well as the complaints filed by the Defendants against Plaintiff.  *Id.* at ¶ 101.  Believing that Attorney Rose would be unable to conduct an impartial review of the cases, the Union sent a message objecting to his involvement in the investigation.  *Id.* at ¶ 102.  Such concerns were rejected.  *Id.* at ¶ 103.  Throughout the investigation of Plaintiff and the Union, Plaintiff was required, under threat of further retaliation, to participate and provide information concerning the activities of the Union, as well as his past performance as an NLPD officer.  *Id.* at ¶ 104.

On July 25, 2023, the Union filed a Municipal Prohibitive Practices (MPP) Complaint alleging that the City of New London, acting through Defendant Wright, violated the Municipal Employee Relations Act by investigating "protected union activity."  *Id.* at ¶ 105.

Suspension and Election Interference

In 2023, Plaintiff decided to run for re-election as Union President.  *Id.* at ¶ 108.  Yet, on September 29, 2023, Plaintiff was placed on administrative leave by the NLPD, pending a pre-disciplinary hearing scheduled for November 2, 2023.  *Id.* at ¶ 109.  Consequently, in an effort to

"stifle [Plaintiff's] ability to communicate with union members and discuss the pending election, update union members on recent activity, and/or lay out his vision for the next two years," Plaintiff lost access to the NLPD grounds, as well as his department computer and email. *Id.* at ¶ 110–112. On October 13, 2023, the Union held a meeting to nominate candidates for the upcoming November election, at which Plaintiff was nominated for Union President, along with another candidate, Brian Laurie, who was a close personal friend of Defendant Galante. *Id.* at ¶ 113–115.

In the weeks leading up to the election, rumors began to swirl within the NLPD regarding Plaintiff's possible suspension, the basis of any such suspension, whether he would be allowed to hold the position, and what would happen in the event he was re-elected and later terminated. *Id.* at ¶ 116. Because Plaintiff was not permitted on the NLPD grounds, he could not respond to the rumors. *Id.* As a result of the aforementioned retaliatory actions against Plaintiff in his capacity as Union President, he was not re-elected. *Id.* at ¶ 117. On February 21, 2024, after one hundred and fifty-one (151) days of administrative suspension, Plaintiff was notified that he was free to return to work. *Id.* at ¶ 118. Ultimately, following Attorney Rose's Internal Affairs investigation, Plaintiff received a three-day suspension, to be held in abeyance. *Id.* at ¶ 119.

**Procedural History**

Plaintiff filed the Complaint on January 16, 2025. Compl., ECF No. 1. The Complaint sets forth the following claims: (1) a Section 1983 claim against Defendants City of New London and Wright, for their alleged violation of Plaintiff's free speech and associational rights under the First Amendment (Counts One and Two); (2) a Section 1983 claim against Defendants City of New London and Wright, for their alleged violation of Plaintiff's constitutional "right to contract" (Counts Four and Five); (3) a Section 1985 claim against all Defendants, arising from their alleged conspiracy to violate Plaintiff's free speech and associational rights, as well as his "right to

7

contract" (Counts Three and Six); (4) a Section 31-51q claim against all Defendants, arising from their retaliation against Plaintiff for exercising his First Amendment freedoms (Count Seven); (5) a common law intentional infliction of emotional distress ("IIED") claim against all Defendants (Count Eight); (6) a common law tortious interference claim against Defendants Wright and Galante (Counts Nine and Ten); and (7) a common law defamation claim against Defendant Wright (Count Eleven).[1]

On April 4, 2025, Defendants filed the instant Motion to Dismiss.  *See* MTD, ECF No. 21. On May 19, 2025, Plaintiff filed his opposition to Defendants' Motion to Dismiss.  Pl. Opp., ECF No. 28.  Defendants filed their reply brief on June 16, 2025.  ECF No. 32.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting

---

[1] Plaintiff's opposition to the Motion to Dismiss does not appear to contest Defendants' arguments that Counts Three, Four, Five, and Six must be dismissed.  Thus, Defendants contend that such claims, in addition to both Count Seven and Count Eight (as to the City of New London only) should be deemed abandoned. *See* Defs. Reply at 6.  The Court agrees in part.  It is well-settled that "[a] plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitute an abandonment of those claims." *Laface v. E. Suffolk BOCES*, No. 18-CV-1314 (ADS), 2019 WL 1959489, at *8 (E.D.N.Y. May 2, 2019) (internal quotation marks omitted) (collecting cases).  Therefore, to the extent that Plaintiff's opposition fails to challenge the arguments for dismissal as to Counts Three through Six, those Counts must be dismissed.  However, the Court declines to deem Count Seven abandoned. Though his opposition may not have addressed every facet of Defendants' argument, Plaintiff has generally responded thereto, and it is clear that he has not abandoned the claim.  Regarding Count Eight, while the Court agrees with Defendants that Plaintiff has not opposed the argument that Defendant City of New London is entitled to immunity on any IIED claim pursuant to Conn. Gen. Stat. § 52-557n(a)(2)(A), as set forth herein, Count Eight is nevertheless dismissed as to all Defendants for other reasons, to wit, Plaintiff's failure to adequately allege that Defendants' conduct was "extreme or outrageous."

*Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Discussion**

In seeking dismissal of the Complaint, Defendants argue that: (a) Plaintiff's purportedly protected speech was made in his capacity as an NLPD employee, and not on a matter of public concern; and that Plaintiff has not otherwise adequately alleged that he was consequently subject to an adverse employment action, or that any such adverse action was causally related to his speech; (b) the Complaint fails to sufficiently allege that Defendants violated Plaintiff's associational rights under the First Amendment; (c) Defendants Wright and Galante are entitled to qualified immunity on Plaintiff's First Amendment claims; (d) Plaintiff's Section 31-51q claims fail for the same reasons as his First Amendment retaliation claims; (e) Plaintiff's IIED claim is barred by governmental immunity and/or fails to sufficiently allege that Defendants' conduct was "extreme and outrageous"; and (f) the Complaint fails to adequately state a tortious interference or defamation claim.[2] In response, Plaintiff contends that the Complaint plausibly alleges that he engaged in citizen speech on a matter of public concern, for which, in turn, Defendants imposed various adverse employment consequences; that Defendants Wright and Galante are not entitled to qualified immunity for such retaliatory actions; and that his Section 31-51q, IIED, tortious interference, and defamation claims are otherwise sufficiently pleaded. For the reasons set forth

---

[2] Insofar as Counts Three through Six have already been deemed abandoned and dismissed, *see supra* n.1, the Court has not recited the arguments advanced by Defendants as to those claims.

below, the Court agrees with Defendants in part, and with Plaintiff in part.  The Court will address each of Plaintiff's claims in turn.

First Amendment – Freedom of Speech (Counts One and Two)

"A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech."[3]  *Galgano v. County of Putnam*, No. 16-CV-3572 (KMK), 2024 WL 1623401, at \*104 (S.D.N.Y. Apr. 15, 2024) (quotation marks omitted) (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)).  Thus, in evaluating Counts One and Two, the Court must first determine whether Plaintiff engaged in protected speech.

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).  "This remains true when speech concerns information related to or learned through public employment.  After all, public employees do not renounce their citizenship when they accept employment, and [the Supreme Court] has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights."  *Id.*  Nevertheless, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Garcetti v. Ceballos*, 547 U.S. 410,

---

[3] "If plaintiff establishes a *prima facie* case, defendant may escape liability if it can demonstrate that (1) it would have taken the same adverse action in the absence of the protected speech, or (2) show that plaintiff's speech was likely to disrupt defendant's activities, and that the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." *Weinstein v. Earley*, No. 3:11-CV-1906 (WWE), 2017 WL 4953901, at \*5 (D. Conn. Nov. 1, 2017), *aff'd sub nom. Weinstein v. Univ. of Connecticut*, 753 F. App'x 66 (2d Cir. 2018) (citing *Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 Fed. App'x. 29, 31 (2d Cir. 2016)).  Defendants do not appear to raise such arguments in their Motion to Dismiss.

418 (2006).  It follows, and indeed, "it is by now well established both that a citizen, upon entering government service, by necessity must accept certain limitations on his or her freedom, and that upon accepting public employment, such employees do not check all of their First Amendment rights at the door."  *Jackler v. Byrne*, 658 F.3d 225, 234 (2d Cir. 2011) (cleaned up) (internal citations and quotation marks omitted).

In *Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968), the Supreme Court "provided the framework for analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees."  *Lane*, 573 U.S. at 236.  Such analysis "requires balancing the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Id.* (cleaned up) (citing *Pickering*, 391 U.S. at 568).  Fifteen years later, in *Connick v. Myers*, the Supreme Court modified the general *Pickering* balancing test to require in the first instance that the government employee's speech be fairly characterized as constituting speech on a matter of public concern.  461 U.S. 138, 150 (1983).  "Thus, under the *Pickering/Connick* balancing test, employee speech in a public workplace is protected from employer discipline if it involves a matter of public concern and if the employee's interest in commenting on the matter outweighs the employer's interest in promoting the efficient performance of public services."  *Trusz v. UBS Realty Invs., LLC*, 319 Conn. 175, 184 (2015); *see also Jackler*, 658 F.3d at 237 ("When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences.") (citation omitted).

In *Garcetti*, the Supreme Court announced an important distinction between "employee speech" and "citizen speech" when determining whether an employee's speech is constitutionally protected, concluding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. In other words, "under *Garcetti*, a court will subject the employee's speech to the *Pickering/Connick* balancing test only if it first determines that the employee was not speaking pursuant to his or her official duties; if the employee was speaking as an employee rather than as a citizen, the speech is not protected by the [F]irst [A]mendment." *Trusz*, 319 Conn. at 185.

Here, the Court construes Plaintiff's First Amendment retaliation claim as arising from three alleged categories of protected speech: (1) the concerns raised by Plaintiff regarding the NLPD's ability to safely staff the Sailfest event in 2022 (the "Sailfest Concerns"); (2) an interdepartmental memorandum regarding Defendants Wright and Galante's misconduct in failing to report and/or otherwise document a use of force incident that occurred at Sailfest (the "General Order 11.6 Memo"); and (3) complaints and/or grievances lodged by Plaintiff on behalf of other NLPD officers, regarding Defendants' mishandling of internal NLPD investigations, to include their purported violations of the City of New London's Workplace Violence Policy, related gender

discrimination, and retaliatory discipline (the "Investigation Complaints").[4]  Plaintiff alleges that in each instance, such speech was protected by the First Amendment insofar as it was made on matters of public concern and in Plaintiff's capacity as Union President, not an NLPD employee. The Court agrees in part.

In evaluating whether the Complaint sufficiently alleges that Plaintiff's speech was constitutionally protected, the Court must first assess whether on each occasion Plaintiff spoke as a citizen, as opposed to an NLPD employee.  *See Garcetti*, 547 U.S. at 418.  If the Court finds that Plaintiff engaged in citizen speech, it must then determine whether the speech involved matters of public concern, and whether the Complaint has sufficiently alleged that Plaintiff's interest in commenting on such matters outweighs the City of New London's interest in promoting the efficient performance of public services.  *See id.*; *see also Pickering*, 391 U.S. at 568.

### *Citizen vs. Employee Speech*

Defendants argue that the speech in question was, on every occasion, made by Plaintiff pursuant to his official duties as an NLPD officer.  By contrast, Plaintiff contends that he was, at all relevant times, speaking in his capacity as Union President.  The Court agrees in part with Plaintiff.

---

[4] The parties do not agree on what specific speech is being advanced by Plaintiff as giving rise to his First Amendment retaliation claims, and indeed, the Complaint, frustratingly, is somewhat opaque on the issue.  Defendants suggest that the purportedly protected speech includes, *inter alia*: Plaintiff's own grievances regarding the August 20, 2022 incident; Plaintiff's related discussion with Defendants Wright and Galante regarding how the NLPD's use of force policy was applied to him; the Union's complaint regarding the attorney overseeing the Internal Affairs investigation involving the issues between Plaintiff and the NLPD; and the MPP complaint filed by the Union against the City of New London for its purported investigation into protected union activity.  *See* MTD at 12–13.  However, the Court has construed those allegations not as asserted protected speech, but rather, as either: (a) the asserted *bases* for the protected speech that ensued; or (b) additional context for Plaintiff's claim that Defendants' acted with a retaliatory motive.  The three specific categories of allegedly protected speech set forth above are derived from the Court's own review of the Complaint, as well as certain clarifying remarks made in Plaintiff's opposition to the Motion to Dismiss. *See* Pl. Opp. at 6.  The Court accepts Plaintiff's clarification, as Plaintiff is obviously the master of his own Complaint. *See Alvarado v. Sweetgreen, Inc.*, 712 F. Supp. 3d 393, 408 (S.D.N.Y. 2024) ("It is axiomatic that plaintiffs are the masters of their complaints.") (citation and internal quotation marks omitted).

Generally, "[i]n analyzing whether a public employee speaks as a citizen for purposes of a First Amendment retaliation claim, [courts] ask whether (1) the speech falls outside of the employee's official responsibilities, and (2) a civilian analogue exists." *Brooke v. Cnty. of Rockland*, No. 21-598-CV, 2022 WL 6585350, at *2 (2d Cir. Oct. 11, 2022) (summary order) (citing *Specht v. City of New York*, 15 F.4th 594, 603 (2d Cir. 2021)).  But "[t]he inquiry into whether a public employee is speaking pursuant to [his] official duties is not susceptible to a brightline rule.  Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two.  Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) (internal citations omitted).  "In some instances, speech may be deemed pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Roman v. Velleca*, No. 3:11-CV-1867 (VLB), 2012 WL 4445475, at *9 (D. Conn. Sept. 25, 2012) (citing *Platt v. Incorporated Village of Southampton*, 391 Fed. App'x. 62, 64 (2d Cir. 2010) (internal quotation marks omitted)).  Yet, "[t]o be sure, the Supreme Court also has emphasized that the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Brooke*, 2022 WL 6585350 at *2 (citing *Lane*, 573 U.S. at 240).  "[T]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Specht*, 15 F.4th at 603–04 (2d Cir. 2021) (citing *Lane*, 573 U.S. at 240).

Importantly, the Supreme Court has concluded that:

> When an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the

14

> employer. The employee is effectively the employer's spokesperson. But when a union negotiates with the employer or represents employees in disciplinary proceedings, the union speaks for the *employees*, not the employer.

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 910 (2018).

A number of Circuit Courts have construed *Janus* as announcing a *per se* rule whereby "speech in connection with union activities is speech 'as a citizen' for purposes of the First Amendment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015); *see Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1059–60 (9th Cir. 2013) ("[A] police officer does not act in furtherance of his public duties when speaking as a representative of the police union."); *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006) ("Because [an employee's] comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than in the course of his employment as a deputy sheriff . . . [*Garcetti*] is inapposite."). However, the Second Circuit has not "decide[d] categorically that when a person speaks in his capacity as a union member, he speaks as a private citizen." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 399 (2d Cir. 2018). Instead, in *Montero*, the Second Circuit found that when a plaintiff alleges that his speech was made in his union capacity, and such speech "was not composed of statements made as a means to fulfill or undertaken in the course of performing his [job] responsibilities," he is speaking as a private citizen. *See id.* Thus, to the extent the Complaint plausibly alleges that Plaintiff's speech was made in his capacity as Union President, and was distinct from his job responsibilities, such speech is likely to pass *Garcetti*'s threshold inquiry.

Turning first to the Sailfest Concerns, the Court finds that Plaintiff has plausibly alleged that he was speaking as Union President, and not in furtherance of his responsibilities as an NLPD employee. Plaintiff alleges that he acted as Union President when he first expressed his concerns, ostensibly to Defendant Wright, regarding staffing at the Sailfest event in 2022. *See* Compl. at ¶

15

25.  When such informal efforts were unsuccessful, Plaintiff, in his capacity as Union President and *on Union letterhead*, wrote the Sailfest Letter to the Mayor and raised the same concerns.  *See id.* at ¶ 26 (citing Letter from Union dated March 22, 2022, Exhibit B).  And after such concerns were once again ignored, the Union posted the letter on Facebook.  *Id.* at ¶ 27.  On each of these occasions, the Complaint plausibly alleges that Plaintiff specifically spoke in his unique capacity as Union President, and in doing so represented the interests of Union members in adequately staffing Sailfest and ensuring the safety of event-goers and the NLPD officers on duty.  In this regard, notwithstanding that Plaintiff's speech *concerned* the duties and functions of NLPD officers, the Sailfest Concerns themselves were not within the normal scope of Plaintiff's duties as an NLPD officer.  *See Lane*, 573 U.S. at 240; *see also Montero*, 890 F.3d at 398 ("Nor is it determinative that [plaintiff's] union remarks may have touched on matters that he learned through the course of his employment.").  Plaintiff was not paid to send letters to the Mayor on Union letterhead, regarding the NLPD's ability to adequately staff a public event.  *See Janus*, 585 U.S. at 905.  Additionally, the Court concludes that the Sailfest Letter undoubtedly has a "citizen analogue," namely, a comparable letter (albeit perhaps not one on union letterhead) from any citizen addressed to their mayor or other public official regarding a purported public safety concern.[5]  The Sailfest Concerns are citizen speech.

Next, as to the General Order 11.6 Memo, Plaintiff alleges that he was speaking as Union President when he filed an interdepartmental memorandum alleging misconduct on the part of Defendants Wright and Galante, for their failure to report or otherwise document the use of force incident that occurred at Sailfest in 2022.  Here, the Court is not persuaded.  According to Plaintiff, General Order 11.6(C)(5) provides that "[i]f an *employee* believes he/she has evidence of

---

[5] Similarly, the Court sees no reason to conclude that an ordinary citizen, concerned about the upcoming Sailfest, could not informally approach Defendant Wright in order to address those concerns, whatever they might be.

misconduct against a supervisor, he/she shall forward a written report regarding same to the Deputy Chief of Police in memo form." Compl. at ¶ 15. To the extent Plaintiff admits that the General Order 11.6 Memo was made pursuant to NLPD policy, he has all but acknowledged that such speech was job-related. Moreover, "[t]aking a complaint up the chain of command to find someone who will take it seriously does not, without more, transform [Plaintiff's] speech into protected speech made as a private citizen." *See Ross*, 639 F.3d at 307; *Weintraub*, 593 F.3d at 204 (citing *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (collecting cases)). Additionally, the circumstances here are similar to those presented in *Shara*, in which the Second Circuit determined that the plaintiff's attempt to frame his speech as union advocacy "d[id] not align with his actual description of the speech at issue." 46 F.4th at 86. Indeed, though Plaintiff may broadly assert that the General Order 11.6 Memo was submitted in his capacity as Union President, the context of the speech—to include that it was made pursuant to NLPD policy, and was otherwise derived from observations made by Plaintiff while on duty with the NLPD at Sailfest—is plainly inconsistent with those allegations. Accordingly, the Court finds that, for purposes of his Section 1983 claim, the General Order 11.6 Memo constitutes job-related employee speech not subject to First Amendment protection.

Finally, regarding the Investigation Complaints, the Court again concludes that Plaintiff was speaking in his capacity as Union President, not an NLPD employee. Courts in this Circuit (and elsewhere) have generally rejected the notion that speech in the form of an employee grievance, *i.e.*, an "avenue unavailable to private citizens," is constitutionally protected. *See Ross*, 693 F.3d at 306 (citing *Weintraub*, 593 F.3d at 203–04). Defendants urge that "this is the same for every grievance" filed by Plaintiff, "whether on his own behalf or on behalf of another." MTD at 16. But in so arguing, Defendants ignore an important distinction. Although the Investigation

17

Complaints might not have a readily comparable "citizen analogue," they still constitute speech outside the bounds of Plaintiff's responsibilities as an NLPD officer.  In *Weintraub*, the Second Circuit held that a public school teacher, who filed a union grievance alleging that school administrators failed to discipline a student, spoke as an employee.  *See* 593 F.3d at 203.  There, the teacher's grievance was deemed employee speech because it was "part-and-parcel of his concerns about his ability to properly execute his duties" as a public school teacher—namely, to "maintain classroom discipline . . ."  *Id.*  By contrast, the Investigation Complaints—*i.e.*, the written complaints made by Plaintiff *on behalf of other NLPD officers*, regarding Defendants' mishandling of internal NLPD investigations—is undoubtedly "part-and-parcel" of Plaintiff's duties as *Union President* in representing those officers.  In this regard, Plaintiff was, in fact, "commissioned . . . to make the speech in question" – just not on behalf of the NLPD.  *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 136 (1st Cir. 2022).  Thus, the Investigation Complaints are citizen speech.[6]

### *Matters of Public Concern*

Having determined that the Sailfest Concerns and the Investigation Complaints did not fall within his job responsibilities as an NLPD officer, and thus get past the *Garcetti* threshold inquiry, the Court turns next to the question of whether such speech was on a matter of public concern.

Speech on a matter of public concern is that which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. "Speech that, although touching on a topic of general importance, primarily concerns an issue that is "personal in nature and generally related to [the speaker's] own situation," such as his or her

---

[6]  The Court would agree that Plaintiff's personal grievances would not be citizen speech protected by the First Amendment.  And while Plaintiff's prolix, kitchen-sink-style Complaint includes allegations regarding his personal grievances, Plaintiff has since clarified that his retaliation claims are not based upon that speech.

assignments, promotion, or salary, does not address matters of public concern. *Jackler*, 658 F.3d at 236 (citation omitted). "To identify matters of public concern, we consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large." *Specht*, 15 F.4th at 600 (citing *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)).

As an initial matter, Defendants do not contest that, at this stage, the Complaint sufficiently alleges that the Sailfest Concerns were on a matter of public concern. *See* MTD at 17.

Regarding the Investigation Complaints, Defendants argue that such speech "primarily concerned an issue that was personal in nature and related to disciplinary issues." *See id.* Defendants equate the concerns raised by Plaintiff in the Investigation Complaints as pertaining to personnel issues, not the public. The Court is not convinced. It is well-settled that "possible governmental misconduct is a legitimate and an important topic of public concern," and "even isolated instances of official conduct may implicate matters of public concern." *Specht*, 15 F.4th at 601 (citing *Gorman v. Rensselaer Cnty.*, 910 F.3d 40, 46 (2d Cir. 2018) ("A single incident of official misconduct may touch on a matter of public concern[.]")). Indeed, "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." *Jackler*, 658 F.3d at 236. Here, insofar as Plaintiff made the Investigation Complaints in his capacity as Union President acting on behalf of other NLPD officers, the grievances and complaints that he filed regarding Defendants' misconduct are of public concern. The Investigation Complaints strove to expose Defendants Wright and Galante's improper handling of various internal investigations, including their failure to dutifully adhere to the NLPD's Workplace Violence Policy, as well as allegations pertaining to investigative errors, entering false

19

information, gender discrimination, and retaliatory discipline.  *See* Compl. at ¶¶ 86–92.  And while the Investigation Complaints stemmed specifically from an internal workplace violence incident, the underlying grievances/complaints speak more broadly to concerns regarding the NLPD's ability and/or willingness to dependably and fairly carry out its own internal investigations.  These issues are unquestionability of significant concern to the community because, *inter alia*, such investigations, albeit not the case here, frequently arise from civilian complaints concerning the conduct of police officers.  Additionally, that the Investigation Complaints may have been motivated in part by Plaintiff's personal grievances with Defendants does not alone render such speech purely private.  *See Specht*, 15 F.4th at 600.  Thus, the Court finds that the Investigation Complaints are citizen speech on a matter of public concern.

### Pickering Balancing

Finally, the Court concludes that Plaintiff has sufficiently alleged that his speech on the foregoing matters of public concern outweighs any interests of the City of New London, as his employer, in promoting the efficiency of the public services it performs through its employees. *See Pickering*, 391 U.S. at 568.  The Court acknowledges the potentially harmful impact that the Sailfest Concerns and the Investigation Complaints might have had on the NLPD's performance of its duties, and on the public's perception of the NLPD.  *See Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002) ("The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias.").  Nevertheless, the Court is ill-equipped to foreclose Plaintiff's First Amendment claims at this early stage, particularly given that Plaintiff's speech was plainly on important matters of public concern.  Indeed, "[t]he *Pickering* test is a fact-sensitive inquiry which is not suited for resolution on a motion to dismiss." *Greco v. City of New York*, 686

20

F. Supp. 3d 191, 200 (E.D.N.Y. 2023) (citations omitted); *but see Mule v. Dep't of Educ. of City of New York*, 797 F. Supp. 3d 9, 40 (E.D.N.Y. 2025) ("*Pickering* balancing is often considered on motions to dismiss in cases where, as here, the record permits resolution of the balancing test."). And here, Defendants have not even argued that the *Pickering* balancing test tips in their favor. Thus, "on this undeveloped record, the Court cannot readily discern every interest at play in this case, or how those interests weigh against one another." *Sugar v. Greenburgh Eleven Union Free Sch. Dist.*, No. 18-CV-67 (VB), 2018 WL 6830865, at *7 (S.D.N.Y. Dec. 28, 2018). The Court finds that the *Pickering* balancing inquiry is better suited for summary judgment, or trial. *See Greco*, 686 F. Supp. 3d at 200.

*Adverse Employment Action and Causation*

Having determined that the Sailfest Concerns and Investigation Complaints are constitutionally protected, the Court must next assess whether the Complaint adequately alleges the remainder of Plaintiff's First Amendment retaliation claims, to wit, that Plaintiff suffered an adverse employment action, and that such action was causally related to Plaintiff's protected speech. *See Matthews*, 779 F.3d at 172. The Court finds that it does.

"In the context of a First Amendment retaliation claim, we have held that [o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d. Cir. 2004)). In this context, adverse employment actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," as well as "lesser actions," including "negative evaluation letters, express accusations of lying," and other administrative repercussions. *See Zelnik*, 464 F.3d at 226 (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).

"[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Abdulaziz v. Bremby*, No. 3:17-CV-663 (RNC), 2018 WL 3764260, at *3 (D. Conn. Aug. 8, 2018) (quoting *Zelnik*, 464 F.3d at 226).

As for causation, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Heim v. Daniel*, 81 F.4th 212, 222 (2d Cir. 2023) (citation and internal quotation marks omitted). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).

Here, the Court construes the Complaint as alleging that Plaintiff suffered the following adverse employment actions: (a) an internal investigation into Plaintiff's use of force on August 20, 2022, which was later substantiated, resulting in a three-day suspension; and (b) an internal investigation into Plaintiff's alleged "violations of the [City of New London's] harassment and discrimination policy, untruthfulness, and respect and courtesy," Compl. at ¶ 100, which resulted in a 151-day period on administrative leave and, eventually, a three-day suspension to be held in abeyance. In seeking dismissal, Defendants acknowledge that Plaintiff's suspensions themselves were adverse employment actions, but argue that the internal investigations involving Plaintiff, as well as his placement on paid administrative leave, were not. From there, Defendants contend that Plaintiff's suspensions (*i.e.*, the concededly adverse actions) were too remote temporally from Plaintiff's speech to plausibly support an inference of any causal relationship. The Court is not persuaded.

The Court agrees with Defendants that "[w]hen relying merely on temporal proximity, courts 'uniformly hold that the temporal proximity must be very close.'" *Anderson v. Lewis*, No.

22

3:20-CV-370 (VAB), 2023 WL 6378924, at *16 (D. Conn. Sept. 29, 2023) (quoting *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). However, the Complaint does not rely on temporal proximity alone to demonstrate causation. Plaintiff asserts that the Sailfest Letter "set[] the causal chain in motion," and that Defendants developed a retaliatory animus in response to Plaintiff speaking out against the NLPD. *See* Pl. Opp. at 17–18. In support of such "retaliatory animus," Plaintiff relies upon: (a) the dishonest disciplinary charges levied (and later falsely substantiated) against him arising from the August 20, 2022 incident; (b) the similarly pretextual internal investigation initiated against him following the Investigation Complaints; and (c) and the fact that he was placed on administrative leave at the height of his bid for reelection as Union President, which he alleges functionally excluded him from the Union election altogether. As a whole, these allegations create a plausible inference that the series of adverse consequences imposed upon him by Defendants was retaliatory, and directly related to Plaintiff's continued efforts—through, *inter alia*, expressing his Sailfest Concerns and in making the Investigation Complaints—to expose mismanagement and/or misconduct within the NLPD. While the adverse consequences of his protected activity may not have followed the protected activity close in time, the adverse consequences are alleged to have occurred after the protected activity as part of an ongoing and continuous effort to discredit and dissuade Plaintiff from engaging in the protected activity. Thus, the Court finds that the Complaint plausibly alleges a causal connection between Plaintiff's speech and Defendants' adverse employment action(s).

**************

For all of the foregoing reasons, the Complaint plausibly alleges that Defendants retaliated against Plaintiff for engaging in constitutionally protected speech, specifically the Sailfest

23

Concerns and Investigation Complaints, and may proceed as to these claims in Counts One and Two.

<u>First Amendment – Freedom of Association (Counts One and Two)</u>

The Complaint also asserts a First Amendment retaliation claim premised on Defendants' violation of Plaintiff's associational rights. Specifically, Plaintiff alleges that Defendants' conduct was "motivated by hostility toward Plaintiff's union advocacy," insofar as Defendants initiated the disciplinary proceedings against Plaintiff as a means of undermining his ability to organize and advocate on behalf of the Union, and relatedly placed Plaintiff on administrative leave in order to effectively undermine his re-election bid for Union president.

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The right to expressive association protects the "freedom to speak, to worship, and to petition the government for the redress of grievances." *See id.* "Included in this right to free association is the right of employees to associate in unions." *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2d Cir. 2013). "Government actions that may unconstitutionally infringe upon this freedom can take a number of forms," including "imposing penalties . . . [on] individuals because of their membership in a disfavored group." *Roberts*, 468 U.S. at 622. "The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 623. As relevant here, "[t]he threshold question for a public employee's claim of freedom of expressive association is borrowed from that of free

24

speech retaliation claims: whether the employee's expressive conduct is as a citizen on a matter of public concern." *Greco*, 686 F. Supp. 3d. at 199 (citation and internal quotation marks omitted); *see also Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) ("a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern.").

Here, the Court has already concluded that in voicing the Sailfest Concerns and the Investigation Complaints, Plaintiff spoke as a citizen on a matter of public concern. It follows that, to the extent the Sailfest Concerns and Investigation Speech were made in Plaintiff's capacity as Union President, Plaintiff's expressive conduct in engaging in such activity on behalf of Union members is, for the same reasons, protected by the First Amendment. *See Greco*, 686 F. Supp. 3d. at 199. Stated differently, Plaintiff's protected speech and his Union activity are, if not one and the same, inextricably intertwined. Thus, the Court's determination above—that the Complaint plausibly alleges that Plaintiff's protected speech was a motivating factor in the adverse employment consequences that ensued—applies with equal force when evaluating Plaintiff's expressive association claim. Defendants contend that they did not prevent Plaintiff from freely associating with the Union. But this argument misses the mark. The relevant inquiry is whether Plaintiff engaged in protected expressive conduct, *i.e.*, advocating on behalf of the Union and its membership, and if so, whether he has plausibly alleged that the adverse employment actions he suffered were causally related to such expressive association. *See Greco*, 686 F. Supp. 3d. at 199. If Plaintiff can, in turn, prove such allegations, he will have demonstrated that Defendants' infringed upon his First Amendment freedom of association. In sum, at this early stage, Plaintiff has plausibly alleged that, as Union President, he engaged in protected expressive conduct and that

25

Defendants retaliated against him for such Union activity.  Therefore, the Motion to Dismiss is DENIED in this regard.

<u>Qualified Immunity</u>

Defendant Wright argues that he is entitled to qualified immunity on Plaintiff's Section 1983 claims.[7]  The Court is not persuaded.

A governmental official is entitled to qualified immunity if (1) his or her conduct did not violate a constitutional right or (2) the right at issue was not "clearly established" at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  To determine if a right is clearly established, courts consider "(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful."  *Clark v. Boughton*, No. 3:21-CV-1372 (SRU), 2022 WL 4778582, at *15 (D. Conn. Oct. 3, 2022) (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993)).  Because a "reasonably competent public official should know the law governing his conduct," qualified immunity "ordinarily should fail" in cases where "the law was clearly established."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982).

It is true that generally, questions of immunity should be resolved "at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  But "[t]he immunity question cannot be resolved *before* the earliest possible stage, *i.e.*, prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised."  *Chamberlain*

---

[7] The Motion to Dismiss argues that both Defendant Wright and Defendant Galante are entitled to qualified immunity, insofar as Defendant Galante is named in Plaintiff's Section 1985 claim.  However, since such claim has been dismissed, the Court need not assess whether Defendant Galante is entitled to qualified immunity.

*Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (emphasis added) (internal quotation marks and citation omitted).  Indeed, where a defendant chooses to press the immunity question at the pleadings stage, "the facts supporting the defense must appear on the face of the complaint, or in its attachments and documents incorporated by reference."  *Sabir v. Williams*, 52 F.4th 51, 63–64 (2d Cir. 2022) (internal citations and punctuation omitted), *cert. dismissed*, 143 S. Ct. 2694 (2023).  "Not only must the facts supporting the defense appear on the face of the complaint, but . . . the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (internal citations and quotation marks omitted).  Moreover, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."  *Id.*  A qualified immunity defense at the pleadings stage thus "faces a formidable hurdle . . . and is usually not successful."  *Sabir*, 52 F.4th at 63–64 (internal citations and quotation marks omitted); *see also Chamberlain*, 960 F.3d at 110 ("[A]s a general rule, the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion") (internal citations and quotation marks omitted).  Defendants do not satisfy this stringent standard.

It is well-established that a government official's retaliation against a public employee for engaging in citizen speech on matters of public concern infringes upon the First Amendment.  *See Dobosz v. Walsh*, 892 F.2d 1135, 1141 (2d Cir. 1989) ("[T]he proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established"); *see also Greco*, 686 F.3d at 202 (defendants not entitled to qualified immunity on expressive association claim).  It is also clearly established that speech regarding government misconduct is of public importance.  *Specht*, 15 F.4th at 601.  As discussed *supra*, Plaintiff has plausibly pled facts which, if proven,

27

demonstrate that Defendants violated his free speech and associational rights under the First Amendment.  Accordingly, whether the circumstances *ultimately proven* fall within clearly established law, or whether Defendant Wright's conduct was reasonable in light of the developed record, is reserved to another day.  Defendant Wright is not, on the basis of the allegations alone, entitled to qualified immunity on Counts One and Two.  He may renew his arguments on summary judgment or at trial.

Section 31-51q (Count Seven)

Plaintiff also brings First Amendment retaliation claims against all Defendants, arising under Section 31-51q.  Section 31-51q provides, in pertinent part, that:

> any employer, including the state and any instrumentality or political subdivision thereof, who subjects or threatens to subject any employee to discipline or discharge on account of (1) the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

To state a claim under Section 31-51q, "a plaintiff must allege four elements: (1) that he engaged in constitutionally protected speech, (2) that his employer took an adverse action against him . . . (3) that there was a causal relationship between the protected activity and the adverse action, and (4) that the exercise of his First Amendment rights did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer." *Kukreja v. Sci. Sys. Co.*, No. 3:24-CV-1364 (SFR), 2025 WL 1549071, at *4 (D. Conn. May 30, 2025) (quoting *Karagozian v. Luxottica Retail N. Am.*, 147 F. Supp. 3d 23, 35 (D. Conn. 2015)) (internal quotation marks omitted).  Section 31-51q "applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen.  The court must

consider, therefore, whether the plaintiff spoke as a citizen upon matters of public concern or instead as an employee upon matters only of personal interest." *Id.* (citing *Campbell v. Windham Cmty. Mem. Hosp.*, 389 F. Supp. 2d 370, 381–82 (D. Conn. 2005)).

As a threshold matter, the Court agrees with Defendants that Plaintiff's Section 31-51q claims against Defendants Wright and Galante in their individual capacities must be dismissed. Courts in this district have interpreted Section 31-51q as applying to *employers only*, and "and have rejected claims brought against individuals. *See Linardos v. Juthani*, No. 3:24-CV-962 (VAB), 2025 WL 887693, at *19 (D. Conn. Mar. 21, 2025) (citing *Lenox v. Town of N. Branford*, No. 3:08-CV-1448 (WWE), 2009 WL 1099118, at *2 (D. Conn. Apr. 23, 2009) (collecting cases)). In other words, Plaintiff's Section 31-51q claim may only advance against his employer, Defendant City of New London. Therefore, the Motion to Dismiss is GRANTED as it pertains to Plaintiff's Section 31-51q claims against Defendants Wright and Galante.[8]

In this vein, the Court concludes that Plaintiff has adequately stated a Section 31-51q claim against Defendant City of New London. To the extent Plaintiff alleges a Section 31-51q violation predicated on the First Amendment, for the reasons set forth above, Plaintiff has plausibly alleged that he engaged in constitutionally protected speech, and that the City of New London, through the conduct of Defendants Wright and Galante, took adverse action against Plaintiff, and that such adverse action was causally related to his protected speech. *Konspore v. Friends of Animals, Inc.*, No. 3:10-CV-613 (MRK), 2012 WL 965527, at *21 (D. Conn. Mar. 20, 2012); *see Downing v. W.*

---

[8] Plaintiff argues that Defendants Wright and Galante's power to discipline, exclude, and punish Plaintiff, combined with their retaliatory conduct, supports their classification as "employers" within the meaning of Section 31-51q. *See* Pl. Opp. at 26. The Court is not persuaded, and indeed, the case law cited by Plaintiff in support of this argument is inapposite, and unavailing. Conversely, in *Nyenhuis v. Metropolitan District Commission*, Judge Thompson dismissed Section 31-51q claims asserted by the plaintiff against two fellow police officers, insofar as they were "not employers of the plaintiff." 604 F. Supp. 2d 377, 385 (D. Conn. 2009). And while the officers in *Nyenhuis* may not have been responsible for investigating the plaintiff and imposing the underlying adverse employment action, Plaintiff here does not convincingly argue that such a nuanced and flexible assessment of the term "employer" is required when evaluating a Section 31-51q claim.

*Haven Bd. of Ed.*, 162 F. Supp. 2d 19, 33 (D. Conn. 2001) ("[Plaintiff's] claim under [S]ection 31-51q is similar to her retaliation claim under [S]ection 1983 and consideration of this count is guided by the court's analysis of the [S]ection 1983 retaliation claim.").  As to the fourth element, the Connecticut Appellate Court has recently determined that "a plaintiff making a claim pursuant to [Section] 31-51q does not have an affirmative burden to plead noninterference[,] [and] [i]nstead, a defendant may raise the issue of interference in a special defense."  *See Michel v. City of Hartford*, 226 Conn. App. 98, 129 (2024) (resolving a split at the Superior Court level).  In light of *Michel*, the Court concludes that Plaintiff was not required to affirmatively plead that his protected speech did not interfere with his job performance or his relationship with the NLPD, although Defendant may raise such a claim as an affirmative defense.  Accordingly, the Motion to Dismiss is DENIED as to Plaintiff's Section 31-51q claim against Defendant City of New London.

To the extent Plaintiff alleges a Section 31-51q claim predicated on a violation of the Connecticut Constitution, additional analysis is warranted.  Although it is well-settled that "Sections 3, 4, and 14 of the Connecticut Constitution 'mirror' the First Amendment to the Federal Constitution, 'in that both protect religious liberty, freedom of speech, and the right to assemble and petition, respectively,'" *Karagozian*, 147 F. Supp. 3d at 35 (quoting *Almonte v. Coca-Cola Bottling Co. of New York, Inc.*, 959 F. Supp. 569, 577 (D. Conn. 1997)), in *Trusz*, the Connecticut Supreme Court declined to adopt the *Garcetti* rule governing First Amendment retaliation claims, in evaluating Section 31-51q claims arising under the Connecticut Constitution.  *See* 319 Conn. at 216.  Instead, the Connecticut Supreme Court adopted a slightly modified version of the *Pickering/Connick* balancing test, whereby even an employee's job-related speech may still be protected if it is a "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety."  *Id.*  Thus, the Connecticut Supreme Court

30

afforded broader protections under the Connecticut Constitution.  Insofar as the Court has already concluded that the Complaint adequately alleges that the Sailfest Concerns and Investigation Complaints were not made by Plaintiff pursuant to his official duties as an officer with the NLPD, the distinction announced in *Trusz* is of no moment.    However, because the Court has concluded that the General Order 11.6 Memo was made pursuant to Plaintiff's official duties, and therefore failed the threshold inquiry under *Garcetti,* it must determine whether such speech fits within *Trusz* and may therefore proceed under Plaintiff's Section 31-51q.  The Court finds that it does.  To the extent that the General Order 11.6 Memo was submitted due to Defendant Wright's failure to report a use of force incident, Plaintiff has plausibly alleged that such speech was a comment on official dishonesty.  For much the same reason, the Court further concludes that the General Order 11.6 Memo involved a matter of public concern.  *See Specht*, 15 F.4th at 601.  Accordingly, while Plaintiff may not proceed on his Section 1983 or Section 31-51q (First Amendment) claim stemming from the General Order 11.6 Memo, he may proceed on his Section 31-51q (Connecticut Constitution) claim arising from General Order 11.6 Memo.

IIED (Count Eight)

Plaintiff asserts a IIED claim against all Defendants, stemming from their "sustained campaign of retaliatory abuse designed to punish the Plaintiff for engaging in protected union advocacy and for criticizing departmental leadership over public safety failures."  Pl. Opp. at 31.

"In Connecticut, to state a claim of intentional infliction of emotional distress, Plaintiff must allege: (1) that Defendants intended to inflict emotional distress or knew or should have known that such distress was a likely result of their conduct; (2) that the conduct was extreme and outrageous; (3) that Defendants' conduct was the cause of Plaintiff's distress; and (4) that the emotional distress sustained by the Plaintiff was severe."  *Doe v. Town of Greenwich*, 422 F. Supp.

3d 528, 545 (D. Conn. 2019) (citing *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000)). Extreme and outrageous conduct is defined as conduct that "exceeds all bounds usually tolerated by decent society." *Crocco v. Advance Stores Co.*, 421 F. Supp. 2d 485, 503 (D. Conn. 2006) (quoting *Carrol v. Allstate Insurance Co.*, 262 Conn. 433, 443 (2003)). Whether "conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the court." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (citing *Johnson v. Chesebrough–Pond's USA Co.*, 918 F. Supp. 543, 552 (D. Conn. 1996)).

Plaintiff's allegations regarding Defendants' conduct simply do not reach this threshold level. The allegations regarding: (a) the manner in which Defendants' conducted their disciplinary investigation into the use of force incident involving Plaintiff on August 20, 2022; or (b) their "unjust[] sidelin[ing]" of Plaintiff during his re-election bid, individually and in the aggregate are not atrocious and do not "exceed all bounds usually tolerated by decent society." *Crocco*, 421 F. Supp. 2d at 503. Indeed, the notion that Defendants' conduct was sufficiently "extreme and outrageous" is belied by Plaintiff's own description of Defendants' actions as "in blatant disregard to and/or contravention of policies, contracts, customs, well established best practices, and common sense." *See* Compl. at ¶ 177. And notwithstanding Plaintiff's attempt to frame Defendants' conduct as "extreme and outrageous," it is clear that Plaintiff is principally challenging Defendants' purportedly retaliatory *motives*. But courts agree that it is Defendants' *conduct*, "not the motive behind the conduct, which courts must evaluate" in connection with an IIED claim. *Turner v. Connecticut Lottery Corp.*, No. 3:20-CV-1045 (VAB), 2021 WL 4133757,

at *14 (D. Conn. Sept. 10, 2021).[9]  And here, while the allegations as to Defendants' conduct, if proven, bespeak very poorly of Defendants' competence and professionalism, they do not so "shock the conscience" as to constitute intentional infliction of emotional distress.  *See Doe*, 422 F. Supp. 3d at 545 (citing *Carone v. Mascolo*, No. 3:06-CV-1094 (DJS), 2007 WL 2318818, at *5 (D. Conn. Aug. 14, 2007)).  Thus, Plaintiff's IIED claim is **DISMISSED**.

Tortious Interference (Counts Nine and Ten)

Plaintiff also asserts tortious interference claims against Defendants Wright and Galante. "A claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Lipkin v. George*, No. 3:23-CV-127 (KAD), 2024 WL 1119958, at *5 (D. Conn. Mar. 14, 2024) (citing *Rioux v. Barry*, 283 Conn. 338, 351 (2007)).  Importantly, tortious interference requires that a third party interfere with "the contractual relations of two other parties." *Metcoff v. Lebovics*, 123 Conn. App. 512, 520 (Conn. App. 2010) (citation and quotation marks omitted). "Thus, there can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract.  The general rule is that the agent may not be charged

---

[9] Plaintiff characterizes Judge Bolden's decision in *Turner* as supporting the notion "that retaliatory personnel actions disguised as neutral disciplinary measures can give rise to a viable . . . intentional infliction of emotional distress claim," and later invokes *Turner* as an asserted basis for denying Defendants' Motion to Dismiss his IIED claim. *See* Pl. Opp. at 32.  But Plaintiff fundamentally misapprehends the *Turner* decision.  There, the plaintiff's IIED claim was premised on allegations that the defendants "improperly suspended [plaintiff] for whistleblowing conduct and for a time period exceeding state regulatory limits; failed to provide a reason as to why she was suspended; staged a 'humiliating spectacle' at which she was required to turn in her key in front of other employees; retained a law firm to conduct an investigation 'for the purpose of broadly disseminating the inaccurate message that Ms. Turner lacked credibility'; and provided her suspension letter to the Hartford Courant for publication." *Turner*, 2021 WL 4133757 at *14.  Notwithstanding this litany of allegations, Judge Bolden *dismissed* the plaintiff's IIED claim, having determined that the foregoing allegations "indicate[d] conduct that is potentially unlawful or influenced by an improper motive, but not 'extreme' or 'outrageous' as defined under state law." *See id.* at **14–15.  As such, if anything, *Turner* supports dismissal of Plaintiff's IIED claim.

with having interfered with a contract of the agent's principal." *Cooke v. Kenny*, No. 3:21-CV-1244 (SALM), 2022 WL 168787, at *5 (D. Conn. Jan. 19, 2022) (citing *Metcoff*, 123 Conn. App. at 520) (internal quotation marks omitted).  Nevertheless, "an exception to the general rule applies if the agent 'did not act legitimately within his scope of duty but used the corporate power improperly for personal gain.'" *Metcoff*, 123 Conn. App. at 521 (quoting *Wellington Sys., Inc. v. Redding Grp., Inc.*, 49 Conn. App. 152, 168 (1998)); *see also Wood & Bricks, LLC v. TD Dev., LLC*, No. 3:16-CV-123 (MPS), 2018 WL 6605623, at *2 (D. Conn. Dec. 17, 2018) ("where the defendant is an agent of a contractual party, the plaintiff must plead that defendant acted outside the scope of his duty to assert a claim for tortious interference in the agent's individual capacity.").

Plaintiff alleges that Defendants Wright and Galante tortiously interfered with his contract with the City of New London, *i.e.*, the CBA, by: (a) falsely initiating internal disciplinary proceedings against Plaintiff; (b) preventing Plaintiff from workplace participation and Union leadership functions, and thereby effectively excluding him from re-election as Union President; and (c) acting with personal animus toward Plaintiff following the Sailfest Letter.  Defendants argue that such claims must be dismissed because Defendants Wright and Galante are agents of the City of New London, not third parties, and the Complaint fails to sufficiently allege that Defendants were acting outside the scope of their employment.  By contrast, Plaintiff asserts that Defendants Wright and Galante were at all times acting outside the scope of their employment and/or their authority as agents of the City of New London, because they "were not merely enforcing policy, but instead acting willfully, maliciously, and outside the scope of their duties, for the improper purpose of silencing and punishing the Plaintiff."  Pl. Opp. at 34.  The Court agrees with Defendants.

The Complaint charges Defendants Wright and Galante, who are unquestionably agents of the City of New London, with maliciously interfering with the City and the Union's CBA, to which Plaintiff is a third-party beneficiary.[10]  In this regard, the Complaint does not appear to state a viable tortious interference claim.  *See Cooke*, 2022 WL 168787 at *5.  As agents of the City of New London, "to hold [Wright and Galante] liable would be, in effect, to hold the [City] liable in tort for breaching its own contract."  *Wellington*, 49 Conn. App. at 168.  Nevertheless, Plaintiff argues that his tortious interference claims are cognizable insofar as Defendants Wright and Galante were acting outside the scope of their authority as agents of the City of New London when they maliciously interfered with Plaintiff's contractual relationship.  *See Metcoff*, 123 Conn. App. at 521.  The Court is not persuaded.

"In determining whether an employee has acted within the scope of employment, courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer."  *Harp v. King*, 266 Conn. 747, 782–83 (2003).  Here, despite Plaintiff's efforts to cast Defendants' conduct as outside the bounds of their job functions, the Complaint itself makes clear that each of the allegedly tortious acts were undertaken pursuant to Defendants' official duties in conducting internal investigations on behalf of the NLPD.  Moreover, the Complaint does not allege that Defendants' conduct took place outside of normal working hours, or typical NLPD workspaces.  And while Plaintiff claims that Defendants acted with malicious intent, he has not plausibly asserted that Defendants' investigative conduct utterly lacked any legitimate motivation to serve the NLPD and the City of

---

[10]  The Court expresses doubt as to whether Plaintiff himself, as opposed to merely the Union, was a party to the CBA for purposes of a valid tortious interference claim.  Nevertheless, the Court need not reach this issue insofar as Counts Nine and Ten are being dismissed on other grounds.

35

New London.  Therefore, the Complaint does not sufficiently allege that Defendants were acting outside the scope of their employment with the NLPD when they purportedly interfered with Plaintiff's contractual relations.

For the foregoing reasons, Plaintiff's tortious interference claims are **DISMISSED**.

Defamation (Count Eleven)[11]

Lastly, Plaintiff brings a defamation claim against Defendant Wright, arising from certain false statements made by Defendant Wright in the December 13th Letter, to wit, that the allegations of "assault on a person/violation of rights" had been "sustained" by the NLPD, when in fact, "only a more general finding of 'conduct unbecoming' was issued."  Pl. Opp. at 38.  Plaintiff claims that this statement "is libelous on its face by virtue of its false and defamatory and malicious nature and its intent to harm the Plaintiff and his reputation with the public."  Compl. at ¶ 206.

"Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation."  *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014).  At common law, to establish a *prima facie* case of defamation, a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."  *Gleason v. Smolinski*, 319 Conn. 394, 430 (2015) (quotation marks and brackets omitted).  "A defamatory statement is defined as a

---

[11] Though Defendants make no such argument in their Motion to Dismiss, the Court observes that this claim appears to be barred by the applicable statute of limitations.  Indeed, it is well-settled that Connecticut applies a two-year statute of limitations to defamation claims.  *See* Conn. Gen. Stat. § 52-597 ("No action for libel or slander shall be brought but within two years from the date of the act complained of."); *see, e.g.*, *Deccan Value LLC v. Malik*, No. FST-CV-21-6052725-S, 2025 WL 1379119, at *4 (Conn. Super. Ct. May 7, 2025) ("[U]nder Connecticut law, the statute of limitations for a defamation claim is two years from the date of publication.") (citing Conn. Gen. Stat. § 52-597).  Moreover, "[t]he statute of limitations for a defamation claim begins on the date of publication" and "a new cause of action arises with each publication."  *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 224 (2004) (citations omitted).  Here, the allegedly defamatory statement—the December 13th Letter—was published on December 13, 2022, and the Complaint was filed over two years later, on January 16, 2025.  Thus, on its face, Plaintiff's defamation claim appears to be time-barred.

communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 431 (quoting *Cweklinsky*, 267 Conn. at 217).

Libel *per se*, as is alleged here, is a libel the defamatory meaning of which is apparent on the face of the statement and is actionable without proof of actual damages. *Stevens v. Khalily*, 220 Conn. App. 634, 646–47 (2023), *cert. denied*, 348 Conn. 915 (2023). "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it." *Id.* (citing *Lega Siciliana Social Club, Inc. v. St. Germaine*, 77 Conn. App. 846, 852 (2003), *cert. denied*, 267 Conn. 901 (2003)). "Connecticut law generally recognizes two classes of defamation *per se*: (1) statements that accuse a party of a crime involving moral turpitude or to which an infamous penalty is attached, and (2) statements that accuse a party of improper conduct or lack of skill or integrity in his or her profession or business and the statement is calculated to cause injury to that party in such profession or business." *Id.* (citing *Silano v. Cooney*, 189 Conn. App. 235, 242 (2019)).

At this juncture, the Complaint sufficiently alleges that Plaintiff was defamed *per se* by the December 13th Letter. Specifically, the December 13th Letter indicates that, following an internal affairs investigation into allegations of "[a]ssault on an [i]ndividual/[v]iolation of [r]ights" arising from the incident on August 20, 2022, Defendant Wright concurred with the finding that such allegations as to Plaintiff were "[s]ustained." *See* Compl. at ¶ 51. The Complaint alleges the December 13th Letter was sent to multiple third parties, including the civilian complainant involved in the incident, and that as a result, that individual filed a criminal complaint against Plaintiff, and Plaintiff and his family received various anonymous death threats. *See id.* at ¶ 52, 54. These allegations, if proven, would unquestionably demonstrate that the December 13th Letter

37

identified Plaintiff, and was published to a third person. *See Gleason*, 319 Conn. at 430. Moreover, the December 13th Letter plausibly constitutes libel *per se*, insofar as the statements made therein surely implicate Plaintiff's skills and integrity as a police officer (and arguably criminal conduct), and Plaintiff has sufficiently alleged that such statements were calculated by Defendant Wright to injure Plaintiff in his capacity as both a police officer and as Union President. *See Silano*, 189 Conn. App. at 242.

In seeking dismissal, Defendant Wright argues that he is entitled to a qualified privilege, given that Plaintiff is a public officer and has not adequately alleged that Defendant Wright acted with the requisite "actual malice." MTD at 38–40. But the Court is not persuaded. To be sure, a defendant may shield himself from liability for defamation by asserting that the communication at issue is protected by a qualified privilege. *See Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 27 (1995). The Court assumes, *arguendo*, that the privilege applies to the December 13th Letter. *See Sevetz v. Coe*, No. 700275, 1990 WL 265738, at *1 (Conn. Super. Ct. Dec. 26, 1990). Further, Defendants are correct that the Connecticut Supreme Court "has concluded that a qualified privilege is lost upon a showing of either actual malice, *i.e.*, publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, *or* malice in fact, *i.e.*, publication of a false statement with bad faith or improper motive." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 630 (2009) (citing *Atwater v. Morning News Co.*, 67 Conn. 504, 514, 516 (1896)). Either showing defeats a claim of qualified privilege. *Id.* Here, the Complaint plausibly alleges that Defendant Wright acted with actual knowledge of the falsity and/or malice in fact. Indeed, Plaintiff claims that Defendant Wright intentionally published the December 13th Letter, which he knew falsely attributed sustained allegations of assault to Plaintiff, and did so in retaliation for Plaintiff's protected Union activity and public speech, in an effort to

38

undermine Plaintiff's professional credibility and exclude him from Union leadership. At the pleadings stage, these allegations are sufficient to overcome any qualified privilege asserted by Defendant Wright. Therefore, the Motion to Dismiss is **DENIED** as to Plaintiff's defamation claim.[12]

**Conclusion**

For all of the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part**. Counts Three, Four, Five, Six, Eight, Nine, and Ten are DISMISSED. Counts One and Two are DISMISSED as to the First Amendment claims premised on the General Order 11.6 Memo. This case shall proceed on: Counts One and Two (as to the First Amendment claims premised on the Sailfest Concerns and Investigation Complaints, and as to Plaintiff's First Amendment expressive association claim); Count Seven (as to the Sailfest Concerns and Investigation Complaints (under both the First Amendment and Connecticut Constitution), *and* as to the General Order 11.6 Memo (under the Connecticut Constitution only)); and Count Eleven.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of March 2026.

 _/s/ Kari A. Dooley_
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[12] Defendants further argue that the charges ultimately substantiated against Plaintiff were related only to "conduct unbecoming of an officer" and "use of force reporting," as clarified in, *inter alia*, the Supervisor's Complaint Report that predated the December 13th Letter. *See* MTD at 40 (citing Exhibit G, ECF No. 21-8). Yet, based on the Complaint, this clarifying information was never provided in connection with the underlying defamatory statement. And in any event, the Report may support the allegation that Defendant Wright acted with actual knowledge of falsity or malice in fact in publishing the December 13th Letter, although such determinations cannot be made at the pleadings stage.